**METROPOLITAN HOUSING DEVELOPMENT CORP. et al., Plaintiffs-Appellants,**

**Northwest Opportunity Center and Eluteria D. Maldonado, Intervening Plaintiffs-Appellants.**

**v.**

**VILLAGE OF ARLINGTON HEIGHTS et al., Defendants-Appellees,**

No. 74–1326.

United States Court of Appeals, Seventh Circuit.

Decided July 7, 1977.

Rehearing Denied Aug. 25, 1977.

Gerald J. Muller, Chicago, Ill., William J. McNally, Boston, Mass., F. Willis Caruso, Robert G. Schwemm, Carol M. Petersen, Chicago, Ill., for plaintiffs-appellants.

Jack M. Siegel, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, and SWYGERT and SPRECHER, Circuit Judges.

SWYGERT, Circuit Judge.

■ In this case plaintiffs seek to compel defendant, the Village of Arlington Heights, Illinois ("the Village"), to rezone plaintiffs' property to permit the construction of federally financed low-cost housing. Plaintiffs contend that defendant's refusal to rezone the property was racially discriminatory. The Supreme Court has determined that defendant's action did not violate the Equal Protection Clause. The remaining issue is whether the refusal to rezone was illegal under the Fair Housing Act, 42 U.S.C. §§ 3601 et seq. We hold that under the circumstances of this case defendant has a statutory obligation to refrain from zoning policies that effectively foreclose the construction of any low-cost housing within its corporate boundaries, and remand the case to the district court for a determination of whether defendant has done so.

I

We will briefly review the history of this case, which has been well documented in previously reported decisions.

The Clerics of St. Viator are a religious order who own eighty acres of property in Arlington Heights. Part of the site is occupied by the Clerics' high school and novitiate building, but much of it remains vacant

land. In 1970 the Clerics decided to use some of the vacant land for low and moderate income housing. It contacted the Metropolitan Housing Development Corporation ("MHDC"), a nonprofit developer which had experience in using federal subsidies to build low-cost housing. On November 7, 1970, the Clerics agreed to sell MHDC fifteen acres in the southeast corner of the property in exchange for $300,000. Execution of the sale was contingent, however, upon the securing of proper zoning from the Village and an agreement from the federal government to provide financial assistance under section 236 of the National Housing Act, 12 U.S.C. § 1715z–1.[1]

The Clerics' property has been zoned R–3, requiring detached single family homes, since the Village first adopted a zoning ordinance in 1959. MHDC intended to construct 190 connected townhouse units, in twenty two-story buildings. Therefore, it could not proceed unless the property was rezoned R–5, the Village's multiple family dwelling classification. It accordingly filed a petition for rezoning with the Village. The material supporting the petition described the proposed development, which was to be called Lincoln Green, and stated that the development's purpose was to use section 236 subsidies to make it possible for people of low and moderate incomes to live in Arlington Heights. It also revealed that the federal government would not subsidize housing under section 236 unless a proposed development was to be racially integrated.

On September 28, 1971, the Village Board of Trustees voted to deny the petition for rezoning. MHDC, along with three black individuals, then filed suit against the Village in the district court for the Northern District of Illinois, seeking declaratory and injunctive relief on the ground that the Village's refusal to rezone was racially discriminatory and violated their rights under the Equal Protection Clause, 42 U.S.C.

§§ 1981–83, and the Fair Housing Act. After a trial, the district court held that the Village's action did not violate the Equal Protection Clause[2] because plaintiffs had failed to prove that the zoning decision would affect members of racial minorities, as opposed to poor people in general, adversely. The court also found that the decision was not motivated by racial discrimination or opposition to poor people, but "by a legitimate desire to protect property values and the integrity of the Village's zoning plan." 373 F.Supp. 208, 211 (N.D.Ill.1974).

This court reversed the district court's judgment. We first held that the district court's finding that the Village's refusal to rezone was motivated by factors unrelated to racial discrimination was not clearly erroneous. We rejected, however, the court's finding that the zoning decision did not have a discriminatory effect. Section 236 required that subsidized housing be limited to low or middle income tenants. Black people in the Chicago metropolitan area, who on the average earn less than white people in that area, constituted forty percent of the group eligible for section 236 subsidization but only eighteen percent of the area's total population. Since Arlington Heights is in the Chicago metropolitan area, the Village's decision, which effectively precluded the construction of low-cost housing on plaintiffs' property, constituted a greater deprivation of housing opportunities for black people than for white people.

We then noted that the fact that the Village's action created a racially disparate impact did not, by itself, subject that action to strict scrutiny under the Equal Protection Clause. But we also concluded that the discriminatory effect of the refusal to rezone could not be examined in a vacuum. Housing patterns in Arlington Heights reflected rigid racial segregation. In 1970 only twenty-seven out of the Village's 64,-884 residents, compared to eighteen percent

---

1. The parties simultaneously entered into a 99-year lease which was effective immediately. The leasehold would also expire if proper zoning and section 236 approval could not be obtained.

2. The court declined to decide the merits of plaintiffs' claim under the Fair Housing Act, apparently because plaintiffs did not pursue it or did not view it as different from their constitutional claim. *See* 373 F.Supp. at 209.

of the residents of the entire Chicago metropolitan area, were black. Moreover, the Village had not taken any affirmative steps to construct low-cost housing which would help remedy this lopsided disparity. In this historical context, the Village's refusal to permit MHDC to build Lincoln Green could not be upheld absent a compelling interest in support of the Village's decision. Since the Village could supply no such compelling justification, we held that it had violated the Equal Protection Clause. 517 F.2d 409, 412–15 (7th Cir. 1974).

The Supreme Court reversed. Although the Court did not question our conclusion that the Village's zoning decision had a racially discriminatory effect, it noted that under *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), decided after we had issued our opinion in this case, a showing of discriminatory intent was a prerequisite to establishing a violation of the Equal Protection Clause. Since we had affirmed the district court's finding that there was no discriminatory purpose behind the Village's refusal to rezone, the Court held that plaintiffs had suffered no deprivation of their constitutional rights. 429 U.S. 252, 264–268, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

The Court then remanded the case for a determination of whether the Village's conduct violated the Fair Housing Act. *Id.* at 268–271, 97 S.Ct. 555. We had not decided the statutory question because, although plaintiffs' complaint mentioned the Fair Housing Act, they did not pursue the statutory claim either with the district court or with this court.[3]

## II

■ The Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, was enacted as Title VIII of the Civil Rights Act of 1968. Plaintiffs contend that the Village's refusal to rezone violated two of the Act's provisions. The first is 42 U.S.C. § 3604(a), which provides

in part that "it shall be unlawful . . . [t]o make unavailable or deny . . . a dwelling to any person because of race, color, religion, or national origin." The second is 42 U.S.C. § 3617, which states:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title. This section may be enforced by appropriate civil action.

Defendant argues that these claims are barred by the Act's statute of limitations, which provides that civil actions to enforce rights granted by section 3604 must be commenced within 180 days after the alleged discriminatory housing practice occurred. 42 U.S.C. § 3612(a). It maintains that plaintiffs failed to file this suit within 180 days after the petition for rezoning was denied.

However, we need not decide whether the complaint was timely under section 3612(a) because defendant failed to raise this issue in the pleadings. A claim that the statute of limitations bars a lawsuit is an affirmative defense, and it must be pleaded or it will be considered waived.[4] *See* Fed.R. Civ.P. 8(c); *Weinberger v. Salfi*, 422 U.S. 749, 764, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). Accordingly, we will proceed to the merits of this case.

## III

In determining whether the Village's failure to rezone violated the Fair Housing Act, it is important to note that the Supreme Court's decision does not require us to change our previous conclusion that the Village's action had a racially discriminatory effect. What the Court held is that under the Equal Protection Clause that conclusion is irrelevant.

---

3. *See* note 2 *supra*.

4. Because of our disposition of this issue, we need not decide whether the statute of limita-

tions contained in section 3612 is applicable to actions brought under section 3617.

We reaffirm our earlier holding that the Village's refusal to rezone had a discriminatory effect. The construction of Lincoln Green would create a substantial number of federally subsidized low-cost housing units which are not presently available in Arlington Heights. Because a greater number of black people than white people in the Chicago metropolitan area satisfy the income requirements for federally subsidized housing, the Village's refusal to permit MHDC to construct the project had a greater impact on black people than on white people. Moreover, Arlington Heights remains almost totally white in a metropolitan area with a significant percentage of black people. Since Lincoln Green would have to be racially integrated in order to qualify for federal subsidization, the Village's action in preventing the project from being built had the effect of perpetuating segregation in Arlington Heights.

The basic question we must answer is whether the Village's action violated sections 3604(a) or 3617 because it had discriminatory effects when that action was taken without discriminatory intent. Since the violation of section 3617 alleged in this case depends upon a finding that the Village interfered with rights granted or protected by section 3604(a),[5] we can confine our inquiry to whether the refusal to rezone made unavailable or denied a dwelling to any person because of race within the meaning of section 3604(a). In resolving this issue we must address ourselves to two preliminary subissues: first, whether a finding that an action has a discriminatory effect, without a concomitant finding that the action was taken with discriminatory intent, is ever enough to support the conclusion that the action violated section 3604(a); and, if so, under what factual circumstances will it be enough?

5. One court has held that a violation of section 3617 can be established without first establishing a violation of sections 3603, 3604, 3605, or 3606 because to interpret section 3617 otherwise would make it superfluous. *Laufman v. Oakley Bldg. & Loan Co.*, 408 F.Supp. 489, 497–98 (S.D.Ohio 1976). We decline to decide whether section 3617 can ever be violated by conduct that does not violate any of the four

A.

The major obstacle to concluding that action taken without discriminatory intent can violate section 3604(a) is the phrase "because of race" contained in the statutory provision. The narrow view of the phrase is that a party cannot commit an act "because of race" unless he intends to discriminate between races. By hypothesis, this approach would excuse the Village from liability because it acted without discriminatory intent. The broad view is that a party commits an act "because of race" whenever the natural and foreseeable consequence of that act is to discriminate between races, regardless of his intent. Under this statistical, effect-oriented view of causality, the Village could be liable since the natural and foreseeable consequence of its failure to rezone was to adversely affect black people seeking low-cost housing and to perpetuate segregation in Arlington Heights.

The Supreme Court adopted the narrow view for equal protection purposes in *Washington v. Davis*, and defendant argues that that decision should bind us in this case as well. However, *Washington* undercuts more than it supports defendant's position. In that case, the Court created a dichotomy between the Equal Protection Clause and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Although the Court announced its new intent requirement for equal protection cases, it reaffirmed the viability of *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), in which it had previously held that an employment practice that produced a racially discriminatory effect was invalid under Title VII unless it was shown to be job-re-

earlier sections. We do hold, however, that under the circumstances of this case, where the conduct that allegedly violated section 3617 is the same conduct that allegedly violated section 3604(a) and was engaged in by the same party, the validity of the section 3617 claim depends upon whether the failure to rezone violated section 3604(a).

lated. 426 U.S. at 238–39, 246–48, 96 S.Ct. 2040. Thus, a prima facie case of employment discrimination can still be established under Title VII by statistical evidence of discriminatory impact, without a showing of discriminatory intent. *United States v. City of Chicago*, 549 F.2d 415, 435 (7th Cir. 1977).

Defendant asserts that Title VII is distinguishable from the Fair Housing Act because Congress in Title VII mandated a more probing standard of review than it did under the Fair Housing Act. An examination of the two statutes, however, does not indicate Congress intended that proof of discriminatory intent was unnecessary under one but necessary under the other. Section 703(h) of Title VII, codified at 42 U.S.C. § 2000e–2(h), states in relevant part:

> [N]or shall it be an unlawful practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.

The Supreme Court in *Griggs* held that this provision did not sanction all employment tests administered without discriminatory intent, in spite of the "because of race" language that it contains. Rather, the Court looked to the general congressional purpose in enacting Title VII—which was to achieve equality of employment opportunities—and interpreted section 703(h) in a broad fashion in order to effectuate that purpose.[6] 401 U.S. at 429–36, 91 S.Ct. 849.

 The purpose of Congress in enacting the Fair Housing Act was "to provide, within constitutional limitations, for fair housing throughout the United States." 42

U.S.C. § 3601. The Second Circuit has observed that the Act was intended to promote "open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat." *Otero v. New York City Housing Authority*, 484 F.2d 1122, 1134 (2d Cir. 1973). Other courts have responded to the congressional statement of policy by holding that the Act must be interpreted broadly. *See, e. g., Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Mayers v. Ridley*, 151 U.S.App.D.C. 45, 465 F.2d 630, 632–35 (*en banc*) (Wright, J., concurring); *Laufman v. Oakley Bldg. & Loan Co.*, 408 F.Supp. 489 (S.D.Ohio 1976); *United States v. City of Parma*, [1973] Equal Opportunity in Housing Rptr. (Prentice-Hall) ¶ 13,616 (N.D.Ohio 1973). *See also Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 95, 97 S.Ct. 1614, 1619, 52 L.Ed. 2d 155 (1977) (recognizing that "Congress has made a strong national commitment to promoting integrated housing"); *Griffin v. Breckenridge*, 403 U.S. 88, 97, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) (Supreme Court has interpreted civil rights statutes broadly).

In light of the declaration of congressional intent provided by section 3601 and the need to construe the Act expansively in order to implement that goal, we decline to take a narrow view of the phrase "because of race" contained in section 3604(a). Conduct that has the necessary and foreseeable consequence of perpetuating segregation can be as deleterious as purposefully discriminatory conduct in frustrating the national commitment "to replace the ghettos 'by truly integrated and balanced living patterns.'" *Trafficante*, 409 U.S. at 211, 93

---

**6.** The Court did not directly construe the "because of race" language in section 703(h). Instead, it held that "any professionally developed ability test" only included tests that were job-related. 401 U.S. at 436, 91 S.Ct. 849, 854. By reading the statutory language in this manner the Court rendered the second half of the provision superfluous since a job-related test would never be "designed, intended or used to discriminate because of race."

The important point to be derived from *Griggs* is that the Court did not find the "because of race" language to be an obstacle to its ultimate holding that intent was not required under Title VII. It looked to the broad purposes underlying the Act rather than attempting to discern the meaning of this provision from its plain language.

S.Ct. at 368, *citing* 114 Cong.Rec. 3422 (remarks of Sen. Mondale). Moreover, a requirement that the plaintiff prove discriminatory intent before relief can be granted under the statute is often a burden that is impossible to satisfy. "[I]ntent, motive and purpose are elusive subjective concepts," *Hawkins v. Town of Shaw*, 461 F.2d 1171, 1172 (5th Cir. 1972) (*en banc*) (*per curiam*), and attempts to discern the intent of an entity such as a municipality are at best problematic. *See Hart v. Community School Board of Education*, 512 F.2d 37, 50 (2d Cir. 1975); Note, *Reading the Mind of the School Board: Segregative Intent and the DeFacto/DeJure Distinction*, 86 Yale L.J. 317, 322–26 (1976). A strict focus on intent permits racial discrimination to go unpunished in the absence of evidence of overt bigotry. As overtly bigoted behavior has become more unfashionable, evidence of intent has become harder to find. But this does not mean that racial discrimination has disappeared. We cannot agree that Congress in enacting the Fair Housing Act intended to permit municipalities to systematically deprive minorities of housing opportunities simply because those municipalities act discreetly. *See* Brest, *The Supreme Court, 1975 Term—Foreword: In Defense of the Antidiscrimination Principle*, 90 Harv.L.Rev. 1, 28–29 (1976).

We therefore hold that at least under some circumstances a violation of section 3604(a) can be established by a showing of discriminatory effect without a showing of discriminatory intent. A number of courts have agreed. *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231 (8th Cir. 1976); *United States v. City of Black Jack*, 508 F.2d 1179, 1183 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *Kennedy Park Homes Assoc., Inc. v. City of Lackawanna*, 436 F.2d 108, 114 (2d Cir. 1970) (dictum), *cert. denied*, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); *Resident Advisory Board v. Rizzo*, 425 F.Supp. 987, 1021–24 (E.D.Pa.1976).

B.

Plaintiffs contend that once a racially discriminatory effect is shown a violation of section 3604(a) is necessarily established. We decline to extend the reach of the Fair Housing Act this far. Although we agree that a showing of discriminatory intent is not required under section 3604(a), we refuse to conclude that every action which produces discriminatory effects is illegal. Such a per se rule would go beyond the intent of Congress and would lead courts into untenable results in specific cases. *See* Brest, *Foreword*, 90 Harv.L.Rev. at 29. Rather, the courts must use their discretion in deciding whether, given the particular circumstances of each case, relief should be granted under the statute.

We turn now to determining under what circumstances conduct that produces a discriminatory impact but which was taken without discriminatory intent will violate section 3604(a). Four critical factors are discernible from previous cases. They are: (1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis*; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing. We shall examine each of these factors separately.

1. There are two kinds of racially discriminatory effects which a facially neutral decision about housing can produce. The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups. *See Trafficante*, 409 U.S. at 209–10, 93 S.Ct. 364.

In this case the discriminatory effect in the first sense was relatively weak. It is true that the Village's refusal to rezone had an adverse impact on a significantly greater percentage of the nonwhite people in the Chicago area than of the white people in that area. But it is also true that the class disadvantaged by the Village's action was not predominantly nonwhite, because sixty percent of the people in the Chicago area eligible for federal housing subsidization in 1970 were white. The argument for *racial* discrimination is therefore not as strong as it would be if all or most of the group adversely affected was nonwhite. *Compare Resident Advisory Board v. Rizzo*, 425 F.Supp. 987, 1018 (E.D.Pa.1976), in which plaintiffs sought to compel the construction of public housing in a predominantly white neighborhood of Philadelphia. Since ninety-five percent of the individuals on the waiting list for public housing in Philadelphia were members of minority groups, the failure to build public housing had a much greater adverse effect on nonwhite people than on white people.

■ The fact that the conduct complained of adversely affected white as well as nonwhite people, however, is not by itself an obstacle to relief under the Fair Housing Act. *See United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *Kennedy Park Homes Assoc., Inc. v. City of Lackawanna*, 436 F.2d 108 (2d Cir. 1970), *cert. denied*, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971). In both of these cases, local zoning ordinances prevented the construction of low-income housing projects which would not have been limited to nonwhite people. Both courts nonetheless found a racially discriminatory effect.

What was present in *Black Jack* and *Kennedy Park* was a strong argument supporting racially discriminatory impact in the second sense. In each case the municipality or section of the municipality in which the proposed project was to be built was overwhelmingly white.[7] Moreover, in each case construction of low-cost housing was effectively precluded throughout the municipality or section of the municipality which was rigidly segregated.[8] Thus, the effect of the municipal action in both cases was to foreclose the possibility of ending racial segregation in housing within those municipalities.

It is unclear in this case whether the Village's refusal to rezone would necessarily perpetuate segregated housing in Arlington Heights. The Village remains overwhelmingly white at the present time,[9] and the construction of Lincoln Green would be a significant step toward integrating the community. The Village asserts, however, that there is a substantial amount of land within its corporate limits which is properly zoned for multiple family dwellings and on which it would have no objection to the construction of a low-cost housing project. Plaintiffs reply that all other sites within the Village limits are unsuitable under federal guidelines governing subsidized housing. The district court never resolved this issue.

---

7. The area of St. Louis County which included the City of Black Jack was approximately ninety-nine percent white. 508 F.2d at 1183.

 The City of Lackawanna has three wards. 98.9 percent of Lackawanna's nonwhite citizens lived in the First Ward, and they constituted 35.4 percent of that ward's population. The Third Ward, where the proposed project was to be built, had 12,229 residents, of whom twenty-nine were black. 436 F.2d at 110; 318 F.Supp. at 674.

8. In *Black Jack*, the city had enacted a zoning ordinance prohibiting the construction of new multiple family dwellings. 508 F.2d at 1183. In *Kennedy Park*, the city imposed a moratorium on the construction of new subdivisions, a

category into which the proposed project fell. 436 F.2d at 111.

9. Defendant asserts that the minority population of Arlington Heights has grown substantially since 1970. It contends that a special census in 1976 showed a black population of 200 and a total nonwhite population of 848. Defendant does not inform us what the total population of the Village now is, but even assuming that it has remained the same since 1970 and that defendant's statements about the 1976 census are accurate, Arlington Heights would be approximately ninety-nine percent white. We find these numbers to be evidence of "overwhelming" racial segregation.

2. The second factor which appears to have been important in previous Fair Housing Act cases which focused on the discriminatory effect of the defendant's conduct was the presence of some evidence of discriminatory intent. In three cases this evidence was insufficient to independently support the relief which the plaintiff sought. *See Smith v. Anchor Bldg. Corp.*, 536 F.2d 231 (8th Cir. 1976); *Black Jack*, 508 F.2d at 1185 n. 3; *Resident Advisory Board v. Rizzo*, 425 F.Supp. at 1021–25 (E.D.Pa.1976).[10] In another case the court found the defendant liable on both a discriminatory intent and a discriminatory impact theory. *See Kennedy Park*, 436 F.2d at 112–14, *aff'g*, 318 F.Supp. at 694–95.

These courts did not address the role that evidence of intent ought to play in determining whether liability should be imposed because of discriminatory impact. But it is evident that the equitable argument for relief is stronger when there is some direct evidence that the defendant purposefully discriminated against members of minority groups because that evidence supports the inference that the defendant is a wrongdoer. Thus, the absence of any such evidence in this case is a factor buttressing the Village's contention that relief should be denied.

We conclude, however, that this criterion is the least important of the four factors that we are examining. By hypothesis, we are dealing with a situation in which the evidence of intent constitutes an insufficient basis on which to ground relief. If we were to place great emphasis on partial evidence of purposeful discrimination we would be relying on an inference—that the defendant is a wrongdoer—which is at best conjectural. In addition, the problems associated with requiring conclusive proof of discriminatory intent which we earlier discussed remain troublesome in any attempt to weigh partial evidence of intent.

The difficulties which arise from taking account of partial evidence of intent can be illuminated by comparing this case to *Black Jack*. In *Black Jack* plaintiffs proposed to build a low-cost integrated housing project in an overwhelmingly white unincorporated area of St. Louis County. The residents of the area blocked the construction of the project by incorporating the area into a city and then enacting a zoning ordinance prohibiting the construction of new multiple family dwellings. The court referred to evidence that opposition to the project was expressed in racial terms by the leaders of the incorporation movement and by the zoning commissioners themselves. 508 F.2d at 1185 n. 3. Moreover, the fact that the zoning ordinance was not enacted until after plans for the project were revealed is further evidence of discriminatory intent which is absent from the case at bar.

It is undeniable that this partial evidence of discriminatory intent undermined the equitable position of the city of Black Jack. In cases such as these, which place broad national goals in conflict with heretofore established local prerogatives, courts must take account of the facts particular to each case. But too much reliance on this evidence would be unfounded. The bigoted comments of a few citizens, even those with power, should not invalidate action which in fact has a legitimate basis. *See Washington v. Davis*, 426 U.S. at 253, 96 S.Ct. 2040 (Stevens, J., concurring). If the goal of most of the residents of Black Jack was to protect local property values rather than to exclude black people, it would be unfair to substantially distinguish between Black Jack and Arlington Heights. Nor is it clear that Black Jack acted with more discriminatory intent than Arlington Heights because Black Jack's zoning ordinance was enacted in reaction to a proposed integrated development while Arlington Heights' zoning ordinance was enacted years in advance of the plans to build Lincoln Green. If the effect of a zoning scheme is to perpetuate segregated housing,[11] neither common sense

---

**10.** In *Rizzo* some of the defendants were found liable without a finding of discriminatory intent while other defendants were held liable on both an intent and an impact theory.

**11.** As we have already noted, it is unclear from the record whether the effect of the Village's zoning scheme, combined with its refusal to rezone the land in question, is to preclude the

nor the rationale of the Fair Housing Act dictates that the preclusion of minorities in advance should be favored over the preclusion of minorities in reaction to a plan which would create integration.

■ 3. The third factor which we find to be important is the interest of the defendant in taking the action which produces a discriminatory impact. If the defendant is a private individual or a group of private individuals seeking to protect private rights, the courts cannot be overly solicitous when the effect is to perpetuate segregated housing. *See Smith v. Anchor Bldg. Corp.*, 536 F.2d 231 (8th Cir. 1976). Similarly, if the defendant is a governmental body acting outside the scope of its authority or abusing its power, it is not entitled to the deference which courts must pay to legitimate governmental action. *See Kennedy Park*, 436 F.2d at 113–14. *Cf. United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach*, 493 F.2d 799, 808–09 (5th Cir. 1974) (decided on equal protection grounds). On the other hand, if the defendant is a governmental body acting within the ambit of legitimately derived authority, we will less readily find that its action violates the Fair Housing Act. *See Joseph Skillken & Co. v. City of Toledo*, 528 F.2d 867, 876–77 (6th Cir. 1975), *vacated and remanded*, 429 U.S. 1068, 97 S.Ct. 800, 50 L.Ed.2d 786 (1977).

■ In this case the Village was acting within the scope of the authority to zone granted it by Illinois law. *See* Ill.Rev.Stat. Ch. 24, §§ 11–13–1 *et seq.* Moreover, municipalities are traditionally afforded wide discretion in zoning. *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). Therefore, this factor weakens plaintiffs' case for relief.

4. The final criterion which will inform the exercise of our discretion is the nature of the relief which the plaintiff seeks. The courts ought to be more reluctant to grant relief when the plaintiff seeks to compel the defendant to construct integrated housing

or take affirmative steps to ensure that integrated housing is built than when the plaintiff is attempting to build integrated housing on his own land and merely seeks to enjoin the defendant from interfering with that construction. To require a defendant to appropriate money, utilize his land for a particular purpose, or take other affirmative steps toward integrated housing is a massive judicial intrusion on private autonomy. By contrast, the courts are far more willing to prohibit even nonintentional action by the state which interferes with an individual's plan to use his own land to provide integrated housing. *See Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). The Second Circuit has explicitly relied on the distinction between requiring affirmative action on the part of the defendant and preventing the defendant from interfering with the plaintiff's attempt to build integrated housing in deciding whether to grant relief under the Fair Housing Act. *Compare Citizens Committee for Faraday Wood v. Lindsay*, 507 F.2d 1065, 1069 (2d Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1679, 44 L.Ed.2d 102 (1975), *and Acevedo v. Nassau County*, 500 F.2d 1078, 1081 (2d Cir. 1974), *with Kennedy Park, supra. See also Joseph Skillken & Co. v. City of Toledo*, 528 F.2d at 878.

This factor favors plaintiffs in this case. They own the land on which Lincoln Green would be built and do not seek any affirmative help from the Village in aid of the project's construction. Rather, they seek to enjoin the Village from interfering with their plans to dedicate their land to furthering the congressionally sanctioned goal of integrated housing.

## C.

■ Analysis of the four factors that we have enumerated reveals that this is a close case. The Village is acting pursuant to a legitimate grant of authority and there is no evidence that its refusal to rezone was

construction of low-cost housing in Arlington Heights and therefore to perpetuate segregated housing. There was no question about the dis-

criminatory effect of the zoning ordinance in *Black Jack.*

the result of intentional racial discrimination. On the other hand, plaintiffs are seeking to effectuate the national goal of integrated housing within Arlington Heights and are asking nothing more of the Village than that they be allowed to pursue that objective. Whether the Village's refusal to rezone has a strong discriminatory impact because it effectively assures that Arlington Heights will remain a segregated community is unclear from the record.

In our judgment the resolution of this case turns on clarification of the discriminatory effect of the Village's zoning decision. We hold that, if there is no land other than plaintiffs' property within Arlington Heights which is both properly zoned and suitable for federally subsidized low-cost housing, the Village's refusal to rezone constituted a violation of section 3604(a). Accordingly, we remand the case to the district court for a determination of this question subject to the guidelines which we shall lay down. Since the Village's zoning powers must give way to the Fair Housing Act,[12] the district court should grant plaintiffs the relief they request if it finds that the Act has been violated.[13]

We realize that, even assuming that plaintiffs are able to show a strong discriminatory effect, only two of the four criteria on which we have focused point toward the granting of relief. As we have already noted, however, the factor of whether there is some evidence of discriminatory intent should be partially discounted. Moreover, if we are to liberally construe the Fair Housing Act, we must decide close cases in favor of integrated housing.

## IV

■ We shall now describe the procedure which the district court should follow on remand.

The district court must first determine whether this case is moot. The original federal subsidy for Lincoln Green was to be obtained pursuant to section 236 of the National Housing Act, 12 U.S.C. § 1715z–1. In 1973, however, the Government suspended new commitments for section 236 payments. Therefore, Lincoln Green can only be built if plaintiffs can obtain another subsidy.

Plaintiffs contended before the Supreme Court that alternative subsidization would be available under section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f. They carry the burden of proving this assertion in the district court.

Plaintiffs must also demonstrate to the district court that Lincoln Green would be racially integrated. They had previously discharged this burden by relying on the requirement of racial integration imposed by section 236. Since section 236 is no longer applicable, plaintiffs must either show that section 8 imposes a similar requirement or otherwise satisfy the court that the tenants of the project would be substantially nonwhite.

Assuming that section 8 funds are available, the district court must then determine whether there is any land in Arlington Heights that is both zoned R–5 and suitable for federally subsidized low-cost housing. The decision as to whether a parcel of land is "suitable" will be greatly simplified by section 8 itself. Section 8(e) sets out restrictions on subsidies granted under section 8, and section 8(e)(3) states: "[t]he construction or substantial rehabilitation of dwelling units to be assisted under this section shall be eligible for financing with mortgages insured under the National Housing Act." The National Housing Act, 12 U.S.C. § 1713(c)(3),[14] provides upper lim-

---

**12.** *See* 42 U.S.C. § 3615.

**13.** We note that Lincoln Green would conform with the standard set by the Village's multiple family zoning classification. We need not reach the question of whether plaintiffs would have been entitled to relief if Lincoln Green had been out of conformance with the Village's

multiple family zoning classification as well as its single family zoning classification.

**14.** 12 U.S.C. § 1713(c)(3) states, in part:
 (c) To be eligible for insurance under this section a mortgage on any property or project shall involve a principal obligation in an amount—
 * * * * * *

its on the cost of mortgages for housing which is eligible for mortgage insurance. The district court should use these upper limits as guidelines in determining whether the cost of a parcel of land would prohibit the construction of low-cost housing.[15] The court should also take account of any other requirements imposed by federal law.

In conducting its inquiry, the district court should place on defendant the burden of identifying a parcel of land within Arlington Heights which is both properly zoned and suitable for low-cost housing under federal standards.[16] If defendant fails to satisfy this burden, the district court should conclude that the Village's refusal to rezone effectively precluded plaintiffs from constructing low-cost housing within Arlington Heights,[17] and should grant plaintiffs the relief they seek.

The cause is remanded for further proceedings consistent with this opinion. Pursuant to Circuit Rule 18, the cause should be heard on remand by a new district judge.

FAIRCHILD, Chief Judge, concurring.

With all respect, I do not subscribe to all the principles and analytical steps described in the opinion prepared for the court by Judge Swygert.

The ultimate question is whether the refusal of the zoning change made a dwelling unavailable to plaintiff Ransom (and others) because of race. If it did, the refusal was unlawful under 42 U.S.C. § 3604(a).

After trial, the district court found that the Village has 60 tracts zoned for R–5 use and some of it is still vacant and available to plaintiff. The proof showed nine undeveloped tracts in excess of 15 acres, zoned R–5. It was not established whether or not these were suitable for low-cost housing under federal standards. A preliminary question arises as to why plaintiffs should have a second chance at this element of the case. I am satisfied that the mandate of the Supreme Court for further consideration of plaintiffs' statutory claim is a reason for affording a second inquiry in this area. The majority's answer appears to be that

(3) not to exceed, for such part of the property or project as may be attributable to dwelling use (excluding exterior land improvements as defined by the Secretary), $19,500 per family unit without a bedroom, $21,600 per family unit with one bedroom, $25,800 per family unit with two bedrooms, and $31,800 per family unit with three bedrooms, and $36,000 per family unit with four or more bedrooms or not to exceed $3,900 per space; except that as to projects to consist of elevator-type structures the Secretary may, in his discretion, increase the dollar amount limitations per family unit not to exceed $22,500 per family unit without a bedroom, $25,200 per family unit with one bedroom, $30,900 per family unit with two bedrooms, and $38,700 per family unit with three bedrooms, and $43,758 per family unit with four or more bedrooms, as the case may be, to compensate for the higher costs incident to the construction of elevator-type structures of sound standards of construction and design; and except that the Secretary may, by regulation, increase any of the foregoing dollar amount limitations contained in this paragraph by not to exceed 50 per centum in any geographical area where he finds that cost levels so require.

15. The court will still have some discretion because the statutory limits on mortgage costs cover the combined cost of land and the construction of housing while the court will only

be considering the variable of land costs. However, the court should be able to obtain objective evidence of the cost of constructing a development such as Lincoln Green aside from the cost of land. By treating the cost of construction as a constant, the court will be in a position to determine whether the cost of a parcel of land, when added to that constant, exceeds the statutory limits.

16. The concurrence argues that plaintiffs ought to bear the burden on this issue. Allocating the burden in this fashion, however, would compel plaintiffs to attempt the almost impossible task of proving a negative. It is far easier for defendant to show that a single parcel of land which is suitable does exist than for plaintiffs to show that no suitable land exists.

17. Defendant asserts that it has fulfilled any obligation with respect to low and moderate-income housing because it is committed to building one hundred fifty units of such housing in the next three years. We disagree. Even assuming that defendant's assertion is accurate and that the commitment will be carried out, Arlington Heights would remain highly segregated. The Village's plan, though laudable, cannot excuse its interference with the plans of individual landowners who are trying to build integrated housing and lessen that segregation.

the Village has the burden on this issue. It seems to be, however, that traditional principles apply and burden should be allocated to plaintiffs.

Arlington Heights is a community of substantial size (64,000 in 1970). It seems clear that housing there is presently almost totally confined to white persons. The substantial percentage of minority persons in the whole metropolitan community and the fact that minority persons are employed in Arlington Heights render it improbable that existing housing segregation there can represent free choice among persons who might reasonably consider living there. Zoning is appropriate for regulating the location of land use within a community. With exceptions, which are rare in this context, it is not appropriate for total exclusion. If on remand it be demonstrated that no suitable site with proper zoning is available, I can accept the conclusion that the denial of a change in zoning was, in the circumstances of this case, unlawful under 42 U.S.C. § 3604(a).