**Edith DREHER, Derek Meyer, Leona Norman, Individually and upon behalf of all others similarly situated, Plaintiffs,**

v.

**RANA MANAGEMENT, INC., NIDC Apartments, Ltd., VII, a partnership, 590–600 Fulton Avenue Corporation, the Village of Hempstead Housing Authority, and several Individuals whose names are unknown, Defendants.**

No. 79 C 2147.

United States District Court, E. D. New York.

July 7, 1980.

Nassau/Suffolk Law Services Committee, Inc., Hempstead, N. Y. by Leonard S. Clark, Susan D. Levering, Hempstead, N. Y., for plaintiffs.

Rains & Pogrebin, Mineola, N. Y. by Mona N. Glanzer, Mineola, N. Y., for defendants Rana Management, Inc. and 590–600 Fulton Avenue Corporation.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Plaintiffs in this action seek primarily to enjoin the conversion of heretofore open market rental apartment buildings at 590 and 600 Fulton Avenue, Hempstead, New York, to housing exclusively for university students attending nearby Hofstra and Adelphi Universities and New York Institute of Technology. They claim that such a conversion constitutes racial discrimination since, according to their allegations, the population of the apartments has recently been at least 90% black but the university students will be at least 90% white. Defendants' actions are alleged to have violated provisions of the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, 1983 and 1985, and the Fair Housing Act of 1968, 42 U.S.C. § 3604. Jurisdiction is predicated on 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. §§ 3612, 3613. Currently before the court are plaintiffs' motion for class certification and the motion of defendants Rana Management, Inc. and 590–600 Fulton Avenue Corporation (collectively "Rana Management") to dismiss the first amended complaint for failure to state a claim upon which relief can be granted or, in the alternative, for summary judgment dismissing the complaint. Rules 12(b)(6) and 56, F.R. Civ.P.

From the parties' papers the following facts appear to be undisputed. Rana Management assumed management and operation of the buildings at 590 and 600 Fulton Avenue in April 1979. At that time, of the 216 apartments in 600 Fulton, 60 were rented to Hofstra and Adelphi Universities under leases that expired May 30, 1979; of the 120 apartments in 590 Fulton, 80 were leased directly to New York Institute of Technology under leases that expired August 31, 1979. Thereafter, in July 1979, Rana Management and Hofstra entered into a lease agreement for the entire building at 590 Fulton for a term from September 1, 1979 through June 30, 1982. Hofstra's purpose was to use the building as a dormitory for its students because of its proximity to the main campus. The lease agreement limits those to whom Hofstra may let the apartments to full-time students in good standing with the university.

According to Rana Management, the Hofstra leasing arrangement provides it with significant financial advantages. For example, under the lease Hofstra is obligated to pay rentals comparable to those that could be obtained in the open market for the entire building whether or not it leased all the apartments to its students. Hofstra is obligated, moreover, to pay additional sums based upon the number of students in residence. The arrangement also provides that one-half of the yearly rental is to be paid at the beginning of the school year and the other half in January. Hofstra assumed much of the cost of management of 590 Fulton, obligated itself to obtain public liability insurance and covenanted to take care of the premises and repair at its own expense damage to the building due to misuse or neglect. Finally, the lease agreement relieved the owner of the risk of loss because of vacancies and other costs of doing business, such as proceeding against tenants for eviction and providing building personnel.[1]

To fulfill its part of the bargain with Hofstra, Rana Management was required to relocate the then occupants of the 590 Fulton building, some of whose leases extended beyond September 1, 1979. Thus, it did not renew some leases which expired prior to September 1, 1979, and relocated 21 non-

---

1. See Johansen Affidavit dated October 3, 1979, and defendants' Rule 9(g) statement submitted in support of defendants' motion. See Rule 9(g), Rules of the United States District Court for the Eastern District of New York.

university tenants, 19 of whom were black and some of whom had existing leases, into the 600 Fulton building. In addition, five of those relocated, including four black tenants whose leases expired prior to September 1, 1979, were also given apartments in the 600 building because there were then available apartments which suited their needs.

When plaintiff Edith Dreher, a black woman, commenced this action she was not a tenant in the 590 building affected by the leasing arrangement with Hofstra University. Her complaint alleges that she has resided at 600 Fulton Avenue for approximately five years, paying her monthly rental of $364.00 with the assistance of funds provided by defendant Hempstead Housing Authority ("Housing Authority") made available through Section 8, Title II, of the Housing and Community Development Act of 1974 as amended. She claims that on July 5, 1979, she received a written notice to vacate her apartment by July 14, 1979, the date her lease expired, and was advised that her lease would not be renewed because the management was replacing her and all other tenants with university students. On or about July 25, 1979, Dreher received formal notice to vacate her apartment within 30 days.

In her original complaint dated August 16, 1979, Dreher sought to enjoin conversion of both the 590 and 600 buildings to housing exclusively for university students on essentially the same grounds asserted in the first amended complaint now before the court. Following a conference held on Dreher's motion for a temporary restraining order preventing her eviction, an order maintaining the status quo as to her was entered on condition that plaintiff maintain her apartment in a clean and sanitary condition. The court added such a proviso on defendants' assertions that the real reason for Dreher's eviction was the unsanitary condition of her apartment.

Thereafter, plaintiff amended her complaint to include plaintiffs Derek Meyer ("Meyer") and Leona Norman ("Norman"), who are former black residents of 590 Ful-

ton Avenue whose lease had expired prior to September 1, 1979. They were not relocated by Rana Management and hence were forced to find alternative housing. Rana Management contends they were not relocated in the 600 building because they shared a two-bedroom apartment in the 590 building and none was then available in the 600 building. Summary dispossess proceedings in State court ultimately resulted in their vacating their apartments at 590 Fulton.

Plaintiffs allege that prior to January 1, 1978, the tenant population at 590 and 600 Fulton Avenue was approximately 90% black, reflecting the demographics of the surrounding community. They point out that the present population of the 590 building is approximately 75% white university students. This sizeable shift in population is claimed to be the result of defendants' pattern and practice of failing to renew leases of black tenants and failing to rent to new black tenants in order to lease the apartments to primarily white university students. They further contend that it is also defendants' intention to lease as many units of the building at 600 Fulton as possible to white university students and to dispossess as many black tenants as possible. The effect of defendants' actions, it is claimed, will be to deprive predominantly low income black tenants of adequate housing in favor of housing for predominantly white university students.

It seems that, with the exception of the attack on plaintiffs' section 1983 claim for failure to allege acts under color of State law, Rana Management concedes that plaintiffs have stated a claim upon which relief can be granted but contends that as a matter of fact and law summary judgment is appropriate. This contention is based on Rana Management's view that defendants did not possess the discriminatory intent for recovery under the Fair Housing Act and sections 1981 and 1982 of Title 42, U.S.C. It further claims that, even assuming a more "liberal" view of the Fair Housing Act—that discriminatory impact or effect is all that is required—defendants' actions did

**933**

not have such an impact or effect. Finally, Rana Management asserts that the section 1985 claim is defective since plaintiffs cannot prove any overt discriminatory acts in furtherance of a conspiracy to deprive minorities of housing.

It is the rule that summary judgment may be rendered only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), F.R.Civ.P. In determining whether to grant a motion for summary judgment, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967), *quoted in SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978). It must accept as true factual statements in the opposing party's affidavits, draw all permissible inferences in that party's favor, *Hill v. A–T–O, Inc.*, 535 F.2d 1349 (2d Cir. 1976), and resolve all doubts in favor of the latter, *American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., supra*.

"The very mission of the summary judgment procedure [however] is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Adv.Com.Note to Proposed Amendments to Rule 56(e), F.R.Civ.P., 31 F.R.D. 648 (1962). As the Court of Appeals for this circuit recently stated:

"Thus, the mere possibility that a factual dispute *may* exist, without more, is not sufficient to overcome a convincing presentation by the moving party. See *Gatling v. Atlantic Richfield Co.*, 577 F.2d 185, 187–88 (2d Cir. 1978), *cert. denied*, 439 U.S. 868, 99 S.Ct. 181, 58 L.Ed.2d 169 (1979). The litigant opposing summary judgment, therefore, 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining trial. *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978). Rather, he must bring to the district court's attention some affirmative indication that his version of relevant facts is not fanciful." *Quinn v. Syracuse Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980).

Applying these principles, it is this court's opinion that summary judgment dismissing the complaint is appropriate, notwithstanding plaintiffs' claim that they have been impeded in opposing this motion by limited discovery. See Rule 56(f), F.R.Civ.P. There being no genuine issue as to any *material* fact and defendant Rana Management being entitled to judgment as a matter of law, its motion for summary judgment is granted for the reasons set forth below.

Clearly the heart of plaintiffs' action is in their claim brought under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* Although their claims under the Civil Rights Act of 1866 are certainly alternative and independent bases for relief, they do not add materially to plaintiffs' contentions in the circumstances of this case. See *Wheatley Heights Neighborhood v. Jenna Resales Co.*, 447 F.Supp. 838, 843–44 (E.D.N.Y.1978). Accordingly, we turn to consideration of the claim under the Fair Housing Act.

In accordance with title VIII, whose primary objective—as put by then-Senator Walter Mondale—is to replace ghettos "by truly integrated and balanced living patterns," 114 Cong.Rec. 3422 (1968), the Act must be broadly construed. See *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Residents Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978). This includes, according to most of the courts that have addressed the question, permitting relief to be had in circumstances where defendant's conduct resulted in discriminatory effects even though unaccompanied by discriminatory intent or motivation. See, *e. g., Resi-*

*dents Advisory Board v. Rizzo, supra; Metropolitan Housing Development Corp. v. Village of Arlington Heights, supra.* See also *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032 (2d Cir. 1979).

Notwithstanding the Act's purpose to promote "open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat," *Otero v. New York City Housing Authority,* 484 F.2d 1122, 1134 (2d Cir. 1973), not every action which produces discriminatory effects is illegal, *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d at 1290. "Rather, the courts must use their discretion in deciding whether, given the particular circumstances of each case, relief should be granted under the statute." *Id.* The Seventh Circuit Court of Appeals went on to identify four "critical factors" in determining under what circumstances conduct that produces a discriminatory impact but which was taken without discriminatory intent will violate section 3604(a):

"(1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis* [426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)]; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing." 558 F.2d at 1290.

■ Certain undisputed facts counsel the exercise of this court's discretion. First, in relocating tenants with unexpired leases from the 590 building, Rana Management gave some 16 tenants, 15 of whom were black, first priority for relocation in the 600 building; five other tenants with expired leases, including four black tenants, were given apartments in the 600 building because suitable apartments were then available. Second, Rana Management has no voice in the rental decisions made by Hofstra University, and approximately 25% of the 590 building's student tenants are from minority groups resulting from Hofstra's non-discriminatory rental policies. Finally, United States census figures for the population of the Town of Hempstead reveal that the minority population of the town is 5.87%. Thus, the 590 building's minority population, although composed solely of university students, is greater than the general population figures.

Assuming this action involves a case of discriminatory effect despite defendants' colorable argument that their conduct had no such effect,[2] the record is bare of even suggestion that plaintiffs have made out—or for that matter can ever make out—a violation of section 3604 or the civil rights laws they have cited. While the percentage of minority tenants at the 590 building has concededly fallen, the current percentage is well in excess of—in fact between four to five times greater than—the general minority population of the Town of Hempstead. As mentioned immediately above, moreover, defendants relocated a number of minority tenants into the 600 building and leased the 590 building to Hofstra, which practices non-discriminatory rental policies. The economic justifications presented by defendants are clearly sufficient on their face, and the consequence of plaintiffs' action would be to compel defendants to affirmatively provide housing for minority group members to the detriment of defendants' valid economic interests, a course of action the Court of Appeals for this circuit has been reluctant to enforce. See *Acevedo v. Nassau County,* 500 F.2d 1078 (2d Cir. 1974).

As we view the issue before the court, the controversy boils down to a question of whether a private landlord can remove heretofore open market housing from the market entirely and enter into a leasing

---

**2.** They claim that their decision has resulted in a larger percentage of minority individuals in the 590 building than that in the general population of the town.

arrangement that affords him superior economic benefits, even though the effect of that decision is to reduce housing available to *everyone* seeking housing in the open market. While the effects of this decision may fall disproportionately on individual minority tenants who had previously occupied the affected housing, and perhaps on the minority community which previously had access to the housing, this alone has never been held sufficient to constitute a violation of the Fair Housing Act. See *Boyd v. Lefrak Organization*, 509 F.2d 1110, 1114 (2d Cir.), *cert. denied*, 423 U.S. 896, 96 .S.Ct. 197, 46 L.Ed.2d 129 (1975).

Here, the defendants determined for reasons that are eminently sufficient and reasonable on their face that, with respect to the 590 building, a lease agreement with a single tenant—Hofstra University, whose rental policies as to its student sub-tenants is concededly non-discriminatory—was in their best interests. Where the record reveals that Hofstra does not employ discriminatory rental practices, the net effect of this arrangement is to deprive the public at large—both minorities and non-minorities—of certain housing opportunities while providing these opportunities exclusively to university students.

The situation, therefore, is wholly unlike cases in which a landowner's conduct with respect to a particular rental decision is called into question, see, e. g., *Robinson v. 12 Lofts Realty, Inc., supra*, 610 F.2d 1032, or a town or municipality acts in some manner inconsistent with fair housing objectives and its obligations, see, e. g., *Angell v. Zinsser*, 473 F.Supp. 488 (D.Conn.1979) (preliminary injunction granted). This case involves the purely private decision of a private landowner to remove his property from the open rental market and to use it in a manner more consistent with his own objectives and desires. This right in the circumstances of this case, we believe, is in no manner diminished by the Fair Housing Act or the various civil rights laws cited by

plaintiffs, and we therefore conclude that defendants' conduct was and is lawful in all respects.

This conclusion applies, of course, to defendants' plan, if any, to remove the 600 building from the open market and lease it for non-discriminatory university housing. As long as the plan results in such a wholesale conversion, at the expense of the general population but in favor of the student population, no violation of applicable law is apparent. Finally, nothing contained in this memorandum and order should be taken as a reflection on the parties' contentions with respect to plaintiff Dreher's tenancy in the 600 building. Any claim that her eviction is improper, based as it is apparently on the conditions in her apartment, raises matters of concern solely for the State courts. The court merely concludes that displacement of tenants at the expiration of their lease period in the circumstances discussed above is lawful. Whether relief from displacement can be granted in other circumstances is a question we need not address.

Accordingly, defendant Rana Management's motion for summary judgment dismissing the complaint is granted.[3]

SO ORDERED.

---

**3.** In the circumstances presented, further discovery requested by plaintiffs will not add appreciably to the record. Nor would it vary the court's view on the legal issues raised by this motion.