[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
This case is an action by the Commission on Human Rights and Opportunities (CHRO) brought pursuant to §§ 46a-83 (d) and 46a-89 of CT Page 9671 the General Statutes. A man named Thomas Rowley filed a complaint with the Commission. Mr. Rowley is the owner of a mobile home and he claims that the defendants "discriminated in the terms and conditions of sale based on the familial status, family with minor children, of the prospective buyer of his mobile home by refusing to approve the sale in violation of Connecticut General Statutes § 46a-64 (c)a(2) and 46a-64
(c)a(3) and Title VII of the Federal Fair Housing Act of 1968 as amended." Paragraph 3 of complaint.
The prospective buyers were Merton Cirrito and Connie Michaud. The rental application for residency in the mobile home park operated by the defendants indicated that in addition to Cirrito and Michaud, four children would be moving into the mobile home Rowley hoped to sell. Both sides attach to their briefs a letter dated September 27, 1997 from an agent of the defendants to Cirrito and Michaud. In pertinent part, the letter said that "after being advised by you that it was your intention to reside at 157 D Street in the park with your four children", the application for residency was being "rejected for the reason that the proposed occupancy by six persons exceeds the number of persons permitted to reside in a mobile home in High Rock Mobile Home Park and the proposed occupancy exceeds the occupancy loads permitted by the State Building Code." Calvin Ackley is a member of the business that owns the park, and in an affidavit attached to the plaintiff's brief indicates that the rules and regulations of the park (occupancy provision) provide that no more than two persons may reside in a mobile home with two bedrooms and no more than three persons may reside in a home with three bedrooms. This requirement has not been strictly enforced according to Mr. Ackley in that in the past four persons have been permitted to reside in a single mobile home.
The defendants have moved for summary judgment. The court will discuss this aspect of the case later, but in their motion the defendants seem to assume that their actions had a "disparate impact" on a protected class because of its familial status, but argue nevertheless that they are entitled to summary judgment on the grounds that the occupancy policies "were based on septic system and other limitations and . . . have a bonafide basis in federal, state and local law, and that the applicants were not qualified to rent a lot in the park." The plaintiff CHRO opposes the motion arguing that there are issues of material fact that prevent its being granted.
The standards to be applied in deciding a motion for summary judgment are well known. If there is a genuine issue of material fact, the court cannot decide it because a party has a constitutional right to a jury trial. On the other hand, if as a matter of law, there is no basis for the action, the motion should be granted so parties will not be burdened CT Page 9672 by suits that are not legally viable.
 I.
This case has been brought under the state and federal fair housing law. In great measure, our law mirrors the federal statute and our court has said that in addressing claims brought under our statute we are properly guided by the case law surrounding the federal fair housing laws even though there may be differences between the state and federal statutes, Zlokower v. CHRO, 200 Conn. 261, 264 (1986).
The court will now indicate the framework and premises on which it will discuss the issues presented by this case. The court will rely heavily on the reasoning set forth in Huntington Branch, NAACP v. Town ofHuntington, 844 F.2d 926 (CA 2, 1988). If it is advisable to turn to federal authority it is certainly best to rely on Second Circuit opinions; it would be inappropriate to do otherwise since similar federal and state laws cover the same territory and property owners and people subject to protection under the act should not have to face contradictory results for the same acts.
There are two theories of discrimination by which plaintiffs may proceed under the federal fair housing act — disparate treatment and disparate impact, Huntington Branch, NAACP v. Town of Huntington,844 F.2d at p. 933; Reeves v. Rose, 108 F. Sup.2d 720, 725 (E.D.Mich, 2000); Snyder v. Barry Realty, 953 F. Sup. 217, 219 (N.D.Ill, 1996); cf. Smith Lee Associates, Inc., et al v. City of Taylor, 102 F.3d 781,790 (CA 6, 1996) (more than one theory can be relied upon). The just cited cases indicate that, unlike a disparate impact claim, a disparate treatment theory, as the term implies, involves an allegation of intentional discrimination — a discriminatory animus or purpose, id. at pp. 790-791. The characterization of a case as involving disparate treatment or disparate impact has important consequences for the analysis to be used in deciding whether a prima facie case has been made out and the nature of the evidence that should be considered by a court in making that determination — all of which is discussed in the Huntington
case at 844 F.2d pp. 933 et. seq.
The complaint is not very illuminating on this question. At paragraph 5 it does state that a CHRO investigator "determined there was reasonable cause for believing that a discriminatory practice had been committed as alleged in the complaint" and Mr. Rowley's complaint" is referred to in paragraph 3 where it simply alleges that Mr. Rowley said the defendants "discriminated in the terms and conditions of sale based on the familial status, family with minor children, of the prospective buyers of (Rowley's) mobile home by refusing to approve the sale" in violation of CT Page 9673 the fair housing acts, both state and federal.
The CHRO brief in opposition to the motion for summary judgment at points reads as if a disparate treatment case was before the court in addition to a disparate impact claim. However, in their motion the defendants represent that the CHRO investigator found "there was probable cause to believe the defendant's occupancy policies has a disparate impact on applicants with children and was thereby discriminatory . . . (and) . . . did not find that the defendants acted with discriminatory intent." The CHRO briefs do not challenge this representation at any point. Interestingly in its opposition to a motion for partial summary judgment filed earlier in this case, the CHRO attached as an exhibit to its brief the final investigative report of the CHRO investigator. Referring to the occupancy provisions of the defendant park, there was no mention of overt intent to discriminate but a finding that the occupancy restrictions (have) a disparate impact on families with children, (p. 15); all other findings mention not at all disparate treatment but discuss facially neutral building code and zoning provisions and the investigator's conclusion that they do not support the defendants' position that in taking the action they did with Cirrito and Michaud they were only following the requirements of those provisions. Since the court cannot conclude the CHRO investigator's reasonable cause finding is based on anything other than her final investigative report and that report characterizes the occupancy provisions as facially neutral as regards familial discrimination the court will treat this as a disparate impact case.
What are the rules established in the federal courts to determine if a prima facie case of disparate impact has been established for a complaint under the fair housing act and how are justifications for such an impact raised by a defendant in such an action treated? The cases on this subject are set forth in a lengthy article in 100 ALR Fed. 97 with an appropriately lengthy title: "Evidence of discriminatory effect alone as sufficient to prove, or to establish prima facie case of violation of Fair Housing Act (42 U.S.C.S. §§ 3601 et. seq)." Zlokower's referral to federal case law in interpreting our act was intended to be helpful to trial courts. But a cursory reading of that article and many of the cases cited therein set forth such a morass of differing opinions in the federal cases on fundamental issues that this court will simply rely on Second Circuit law. As Huntington points out, a disparate impact analysis examines a facially neutral policy such as the occupancy provisions of the defendant park. Under such an analysis, a court first determines if a prima facie case is made out; "a prima facie case is established by showing that the challenged practice of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect"[1] and in relying on such an analysis "the CT Page 9674 plaintiff need not show that the decision complained of was made with discriminatory intent," id. p. 934. Speaking of racial discrimination but with equal import for familial discrimination the court on the same page said that the fair housing act's "stated purpose to end discrimination requires a discriminatory effect standard; an intent requirement would, strip the statute of all impact on de facto segregation" (as well as all impact, it might be added, on housing availability in restricted housing markets where census figures indicate a high proportion of family units with children). The court noted that the federal equal employment act set forth in Title VII does not require a showing of intent and that courts and commentators have noted that that statute and the federal fair housing statute require similar proof to establish a violation. Intent is too heavy a burden to place on plaintiffs, the court reasons, as intent is easy to conceal and intent confuses and skewers the main task in trying to establish a prima facie case which is to determine the impact of the action, id. p. 935.
Once a prima facie case is established then the court determines whether nevertheless the defendant can avoid liability. Huntington relies in part on two leading cases, Metropolitan Housing Dev. Corp. v. Villageof Arlington Heights, 558 F.2d 1283 (CA 7, 1977); and Resident AdvisoryBoard v. Rizzo, 564 F.2d 126 (CA. 3, 1977). Huntington involved a suit against a government entity but the considerations that are to apply once a prima facie case is established would appear to be the same no matter what the status of the defendant in a fair housing case, private or public. Basically, a court must weigh any adverse impact of a policy against its justification.
A defendant must show that the reasons for its policy were legitimate and bonafide. In Huntington, the issue was framed in terms of whether a bona fide government interest was being served. In a case where the defendant is a private entity the defendant by way of justification "must prove a business necessity sufficiently compelling to justify the challenged practice," U.S. v. Robert Weiss, et al, 847 F. Sup. 819, 831
(D.Nev., 1994), quoting from pre-familial amendment case of Betsey v.Turtle Creek Assoc., 736 F.2d 983, 988 (CA. 4, 1984). That court noted the "business necessity formulation has been applied in employment discrimination cases arising under Title VII.
The Huntington court, almost as an analytical aside, then states that in weighing the justification offered in a disparate impact case a court can factor in "intent." The court said: "Though we have ruled that such intent is not a requirement of the plaintiff's prima facie case, there can be little doubt that, if evidence of such intent is presented, that evidence would weigh heavily on the plaintiff's side of the ultimate balance," id. at p. 396.[2]
CT Page 9675
Finally, Huntington says that in balancing the showing of discriminatory effect against justifications and deciding what ought to be done the balance should more readily be struck in favor of a plaintiff where, for example, injunctive relief is sought or the mere changing of a policy as a means to correct the disparate impact as opposed to fashioning an order to correct that impact which would require a defendant to expend large sums of money or effort. Huntington, as noted, involved an action against a municipality but the same consideration is factored in when a complaint is brought against a private party. This consideration, as regards private parties, is really related to the business necessity/alternative solutions test as indicated in the sweeping statement in U.S. v. Weiss, supra, where the court predicting the outcome of its analysis says:
 "The question herein presented is can this court, upon finding that defendants' housing occupation policy limits the availability of apartments for families with children — a prima facie violation of the act as plaintiff contends, issue an order that defendants — private persons — must expend $1.63 million to upgrade their heating system or go out of business?" 847 F. Supp. at pp. 829-830.
For the court, at least, this is one of the more difficult considerations. What if a million dollars did not have to be spent to correct or reduce the disparate impact but twenty thousand? Is it a will it force them out of business test? Should financial statements be presented? Is the propriety of forced expenditure due to agency or court action more appropriate if the disparate impact is greater?
These are the considerations set forth by the Huntington court to test whether the elements of a case have been established under the federal Fair Housing Act. Before discussing the particular facts of this case the court will refer to one aspect of the previous discussion which is dealt with in a report issued by HUD. That report focuses on the situation where a disparate impact case has been established prima facie and the question becomes was there a justification or a legitimate reason for the policy leading to such disparate impact. This court believes theHuntington court basically reflects the HUD position on this question; the court will now refer to HUD policy.
Although not binding on state courts, a report issued by the Department of Housing and Urban Development (HUD) is instructive and should be mentioned — it is, after all, the agency responsible for administering the federal Fair Housing Act and its pronouncements are CT Page 9676 taken into account by the federal courts in deciding cases under the act. The HUD report appears at volume 63, page 70256 (1988) of the Federal Reporter.
The language is quite general. The document says that there was no indication that through the passage of the Fair Housing Act and the familial status amendments regarding children, Congress intended that the "owner or manager of dwellings would be unable to restrict the number of occupants who could reside in a dwelling." "Reasonable occupancy standards" would depend on factors such as "the number and size of sleeping areas and the overall size of the dwelling unit." HUD will "carefully examine any such non-governmental restriction." In addition, the report goes on to refer to other factors that can appropriately be taken into account in setting occupancy limits. Thus, HUD "will consider limiting factors, identified by housing providers, such as the capacity of the septic, sewer or other building systems. HUD has determined that an occupancy policy of two persons in a bedroom "as a general rule, is reasonable" but the whole purpose of the policy statement represented by the 1998 report was to indicate this suggestion was only a guideline; "the reasonableness of any occupancy policy is rebuttable and HUD will not determine compliance with the Fair Housing Act based "solely on the number of people permitted in each bedroom."
When all is said and done, this statement in the federal register does not modify the reasoning of cases like Huntington. Basically, the HUD report operates on the premise that certain non-governmental policies will have a disparate impact on families with children, that is why the report goes on to say as noted, "the Department will carefully examine any such non-governmental restriction to determine whether it operatesunreasonably to limit or exclude families with dependent children."
This is nothing more than the Second Circuit test. In commenting on the necessary inquiry that must be made after a prima facie case of disparate impact has been made the court in Fair Housing Council of Orange County,Inc. et al v. Ayres, 855 F. Sup. 315, 318 (D.Cal., 1994) said:
 "After a plaintiff establishes a prima facie case, a presumption of illegality arises and defendant has the burden of articulating a legitimate, nondiscriminatory justification for the challenged policy. . . . The Second Circuit has stated a relatively light burden; defendant must show only that the policy was established for a legitimate nondiscriminatory reason. Soules v. HUD, 967 F.2d 817, 822 (CA., 2, 1992).
CT Page 9677 Interestingly, HUD issued a so-called Mountain Side II ruling which applies a stricter standard — "the defendant must show use of the least restrictive means to achieve a compelling business standard,"855 F. Supp. at p. 318.
The court will now turn to the facts of this case applying the tests set forth in Huntington. First, the issue of establishment of a prima facie case will be discussed, then the issue of justification once such a case has been established.
The court will, as noted, use the Second Circuit standard which basically says, given the disparate impact, was the policy reasonable — that is "established for a legitimate nondiscriminatory reason."
The court, using this standard, will now examine the reasons presented by the defendants to justify their policy.
 II.
The brief filed in support of the defendants' motion for summary judgment refers to the fact that the CHRO investigator concluded that there was probable cause to believe that the defendant park's occupancy rules had a disparate impact on families with children," page 3 of September 5, 2000 brief. The occupancy rules for the park provided that no more than two people could reside in a mobile home with two bedrooms and no more than three people if there were four bedrooms; later in the litigation it was indicated the occupancy provision was no more than three people for two bedrooms and no more than four for three bedrooms. The many cases discussed in the article in 100 ALR Fed. 97 seem to indicate that a prima facie case of disparate impact cannot be made out by what would seem to be a common sense extrapolation from occupancy provisions like those just mentioned that the number of children who could occupy such a residence would be limited. Rather, census figures from the surrounding area must be presented in a familial impact case which break down families into various sizes, show the percentage of the population represented by such family groupings and thus offer some guidance as to the true nature of the general impact of any particular private entity's occupation policies on housing availability, see U.S. v. Lepore,816 F. Sup. 1011, 1020 (M.D.Pa., 1996); Mountain Side Mobile EstatesPartnership, et al v. Secretary of Housing Urban Development,56 F.3d 1243, 1252, 1253 (CA. 10, 195); U.S. v. Tropic Seas, Inc.,887 F. Sup. 1347, 1360 (D.Haw., 1995), cf. Pfaff v. U.S. Dept. ofHousing, 88 F.3d 739, 746 (CA. 9, 1996): "To establish a prima facie case of discrimination without intent, the charging party must prove the discriminatory impact at issue; raising an inference of discriminatory impact is insufficient. . . . Valid statistical evidence is admissible CT Page 9678 for this purpose. . . . A party charged with discrimination may diffuse a prima facie case against (it), and hence, avoid the need to supply a legally sufficient non-discriminatory reason in rebuttal by successfully challenging the statistical basis of the charge." For the purposes of this motion alone, the court concludes that the defendants are not challenging the prima facie case of disparate impact. It must be said that setting the case in this posture could present analytical difficulties since it might be helpful to know the severity of the disparate impact in weighing the justifications offered by a defendant for continuation of its policy. In other words, a court must weigh any adverse impact against its justification. It is difficult to do that without knowing the extent of the adverse impact.
The court will assume for purposes of discussion that a prima facie case of disparate familial impact with regard to children has been established. Then, according to Huntington, the court must consider the justifications offered for its policy.
 III.
The occupancy provisions of the park provide that no more than two people shall occupy a two-bedroom mobile home and no more than three people shall occupy a three-bedroom mobile home (later in the litigation, as indicated, this was amended). As noted, the court will assume, as the defendants seem to for the purposes of their motion, that this establishes a prima fade case of disparate impact. The defendants, however, present a justification defense of business necessity — that there was a legitimate, bona fide reason for the policy.
The defendants point out that at this park six lots share the same leaching field, including the one owned by the plaintiff. An engineering firm engaged by the defendants to review the capacity of the leaching field submitted a report which concluded that the leaching field "is at capacity based on Department of Health criteria;" the report recommended that to maintain the park's septic systems, mobile homes should be limited to three residents per unit. It further recommended the septic tanks should be inspected every two to three years and the leaching fields should be inspected every two weeks. The preparers of the report are consulting engineers and no issue is raised as to their status as experts. In the report it is stated that: "Design and installation of subsurface sewage disposal systems is governed by the Connecticut Public Health Code Technical Standards. These standards have been used as a basis for the study of the subject system." Copies of what these experts claim are pertinent sections of the health code are attached to their report. Using the state health code with three residents per unit the existing system is operating at 140 percent of design capacity and the CT Page 9679 leaching field is less than 50 percent of the field size that would be necessary if designed today.
In opposing the reliance of the defendants on their expert the plaintiff relies on a criticism of the report submitted and an affidavit by their own expert. First, it should be noted that in summary judgment procedure, although Practice Book § 17-45 requires the party opposing the motion to file counter affidavits, the party's failure to do so does not mean the sufficiency of the moving party's affidavits cannot be attacked. Evans Products Co. v. Clinton Bldg. Supply, Inc., 174 Conn. 512,514 (1978); McGilicuddy v. Giga Plus, Inc., 7 C.S.C.R. 323 (1992). Furthermore, jurors are told in any case involving experts that tests of credibility are applied to their testimony and that they can reject the opinion of any expert if his or her opinion is based on subordinate facts they do not find proven. Nash v. Hunt, 166 Conn. 118, 426 (1974); it would seem that trial courts should have the same ambit of review when examining expert reports submitted in summary judgment procedure.
The defendants' report is divided into two sections. The first section talks about the "effective leaching area required;" the second section refers to the "capacity of the existing system."
The first section on leaching area, to the court at least, is somewhat confusing. A six-unit common leaching area is being discussed with an assumption that the mobile homes on these lots will have 15 bedrooms. The analysis is done in terms of bedrooms, not occupants, but in the design manual at the end of the expert's exhibit it is assumed that there would be two occupants per bedroom — does this assumption apply to both sections of the report? Using a Table 6 at one point, the report states 3,375 square feet is the effective area required using bedrooms as a control.
Then the report goes on to discuss "high ground leaching trenches." What they are and why they are a consideration or requirement for the six lots under examination are not explained. Then "total field areas" are discussed whose size increases depending on the number of these trenches. It is then pointed out that the existing leaching field is about 90' x 40' or 3,600 square feet "which is less than 50 percent of the field size that would be necessary if designed today." The predicate facts on which the conclusion is based are not clearly stated, let alone explained. All of this is somehow related to percolation rates, but Table 6 explains that lots, such as the ones now before the court, may use the less than 5-minute per inch rate if site conditions prohibit installations sized above 1 to 10 minute/inch rates. The plaintiff points out that the report relies upon a slower percolation rate which would increase the necessary leaching area. The answer to that in a reply CT Page 9680 affidavit submitted by the defendants is not very illuminating:
 "5. . . . The report that I prepared noted that the soil in the vicinity of these homes was saturated and could not drain additional water (see p. 3 of the report). I used a percolation rate of 10 to 20 minutes per inch because that is a reasonable rate for frequently saturated soils. If I utilized a rate of 1 to 10 minutes per inch in any equations, the existing system would still be substandard."
It is unclear as to where on page 3 of the report the expert says the soil was saturated — could it be the point where it is stated that "the ground water level on that day was 3 to 4 inches below the surface." Does that signify saturation? And what, if any, significance should be attached to the use of the word that — does it mean there was particularly heavy rainfall that day or for a few days before the date on which the testing was done? If so, what significance does that factor have to the usefulness of testing results? The affidavit said if a 1 to 10 minutes per inch ratio were used, "the existing system would still be substandard." What does "substandard" mean in this context — related to what standard and how is that related, if at all, to the previously quoted language in Table 6 that lots in existence prior to 1994 may use the less than 5 minute per inch rate — in any event, how is this rate related to the rate actually used by the expert?
The second part of the report submitted by the defendants' expert concerns itself with the "capacity of the existing system." The court is somewhat confused about the relationship of the findings in this part of the report to the first section, which, as discussed, concerned itself with what would be an effective leaching field. In any event, the first sentence of this second section indicates the leaching field "has functioned properly for 30 years" although it concludes with an observation that applying the state Health Code, the existing system "is operating at 140 percent of design capacity." The plaintiff points out, however, that the provisions of the code relied upon by the defendants' experts apply to new construction or situations where there has been repair to an existing system — none of these factors relate to this mobile park. Also, the plaintiff has submitted a report from its own expert which basically says that the appropriate section of the health code that should be referenced in this case is § 19-13-B104 since this mobile park sewage system is a "community sewerage system." Therefore, none of the standards relied on in the report of the defendants' expert are applicable since they are not contained in § 19-13-B104. CT Page 9681
From all of this, the court cannot conclude that, given the present state of the record, failure of the defendants to enforce the occupancy provision at issue here would violate the provisions of the state health code; the argument from the code is not even postured in that way. At the most, if that, the references to the code and the provisions of the code may be some evidence of the appropriate standards the park should adopt as to occupancy and may offer some guidance to the trier of fact on this issue, cf. Wendland v. Ridgefield Construction Service, Inc.,184 Conn. 173, 181 (1981), but this is far from satisfying, for summary judgment purposes, even the relaxed standards of the Second Circuit in showing a legitimate business reason for the occupancy provision based on references to the adequacy of the sewer system. The Huntington court makes clear that once a prima facie case is established, the burden of explanation shifts to the defendant under the Fair Housing Act to prove that its actions had a legitimate and bona fide basis. This would logically apply to any argument that reasons of business necessity required a policy — such as an occupancy provision — which would have a disparate impact to family status. See 844 F.2d at p. 936, also see Fair Housing Council v. Ayres, supra, at 855 F. Supp., p. 318, cf. Potomac Group Home v. Montgomery Cty., 823 F. Sup. 1285, 1296
(D.Md., 1993).
The defendants rely heavily on two cases. U.S. v. Weiss, 847 F. Sup. 819
(D.Nev., 1994); and Mountainside Mobile Estates Partnership v. Sec. ofHUD, 56 F.3d 1243 (CA. 10, 1995).
In Weiss, there was a claim of housing discrimination based on familial status — occupancy was limited for rental units to no more than three people in a two-bedroom unit and four in a three-bedroom unit. The defendant claimed the hot water system capacity limited the number of possible residents and business necessity justified the just mentioned occupancy limitation. The evidence of business necessity in Weiss was very different from that presented here. In that case, the owners took over a deteriorated housing complex where one of the chief complaints was lack of hot water; that was the reason for the occupancy limitation, id. p. 830. The defendant's expert specifically found that the heaters in use could serve a specified number of people; more people could be serviced only if an expensive upgrade were to be done, id. pp. 822-823. There is really no other reference to the content of the expert report. The report submitted in this case apart from relying on questionable sections of the state health code does not contain specific studies done by the expert as to the actual capacity of the existing system to accommodate more people than the occupancy provision permits or the effectiveness of the leaching area under such circumstances. The report simply says if designed today the leaching field would be 50 percent less than recommended by the code and is operating at 140 percent of design capacity under the code. There CT Page 9682 is no claim that the code is now being violated or would be violated even if more occupants per mobile home were permitted, let alone any claim supported by evidence or testing that apart from references to the code the leaching field is inadequate or the capacity of the system is insufficient to accommodate more people than now provided for in the occupancy provision.
In Mountainside, at 56 F.3d pp. 1255-1256, the reports submitted by consultants and experts to establish "business necessity" to rebut the prima facie case of disparate impact were qualitatively different from the report submitted here. The reports were fact specific to the case — one consultant noted that "historically, the park experienced periods of low water pressure and sewer blockages," id. p. 1255. Another expert was offered, Walker:
 "Mr. Walker estimated the adequacy of the park's sewer system based on repair records and interviews with David Ramstetter, who performed maintenance for the park. Based on these sources, the study concluded that sewer pipes were adequate to support a maximum of 916 persons. This figure was arrived at after an estimation of the sufficiency of the sewer system during "peak hours," defined as prior to 8:00 a.m., before people leave for work, and later than 5:00 p.m., after people return home from work. The study concluded that four people per unit, or a maximum of 916 persons, `puts the sewer system at its capacity. . . .' Because the 916 population limit is a recommended maximum, Mr. Walker opined that if an additional 30 guests are at the park at peak time, `some portion of the [sewer] system will be overloaded,'" id., p. 1256.
The court noted that although a recommended excavation of the sewer system was not conducted to further examine it the report actually submitted in Mountainside involved factually based occupancy studies related to the actual operation of the sewage system not mere references to health code provisions which, for reasons previously stated, the court has difficulty with as a basis to establish a business necessity justification. The court concludes on the state of this record that it cannot conclude as a matter of law that the business necessity justification has been sufficiently established to overcome the prima facie case of disparate impact which for the purposes of this motion only the court assumes has been established.
 IV. CT Page 9683
But besides "business necessity" other justifications are offered for a policy that otherwise, for the purposes of the motion, are conceded to have a disparate impact on families with children. It is argued that there is a legitimate and bona fide reason for the occupancy provision which would bar this family from the park. This is so because the zoning regulations of the Town of Groton and state and federal regulations and law bar the occupancy. In fact, the state and federal Fair Housing Acts provide exemption from their operation where reasonable state and local occupancy limitations are in force.
 (a.)
The town's zoning regulations state that a "manufactured (mobile) home" is defined as: "A transportable single-family dwelling unit." A "dwelling unit" is defined as "a dwelling . . . occupied or intended to be occupied by one family for residence purposes." And a "family" is defined as: "Any number of individuals related by blood, marriage or adoption, living together as a single housekeeping unit. A group of not more than four persons keeping house together, but not necessarily related by blood or marriage, may also be considered a family." Both the state and federal Fair Housing Acts have provisions barring application of these statutes, under certain circumstances, where local or state law have occupancy provisions which inferentially otherwise have a desperate, discriminatory impact.
Subsection (9)(c)of § 46a-64c of the Connecticut General Statutes states that:
 "(c) Nothing in this section limits the applicability of any reasonable state statute or municipal ordinance restricting the maximum number of persons permitted to occupy a dwelling."
This parallels subsection (b)(1) of § 3607 of the federal Fair Housing Law which states that:
 "(1) Nothing in this subchapter limits the applicability of any reasonable local, state or federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling."
Both statutory subsections use the word "reasonable" and it must be presumed that the legislatures, state and federal, had a purpose in mind when they did so. The common sense reading of these statutes is that although local ordinances restricting the maximum number of occupants may CT Page 9684 be exempt from the operation of the fair housing acts, for such exemption to apply they must be "reasonable."
The federal Supreme Court interpreted the ambit of § 3607(b)(1) inEdmonds v. Oxford House, Inc., 514 U.S. 725 (1995). The court said that the purpose of the statutory section was "to protect health and safety by preventing overcrowding," id. p. 733. But where an exemption from the fair housing act is sought the court must determine, for example, whether the zoning regulation "qualifies as a restriction regarding the maximum number of occupants permitted to occupy a dwelling within the meaning of" the exemption provided for in § 3607(b)(1). The court noted that "maximum occupants . . . cap the number of occupants per dwelling, typically in relation to available floor space or the number or type of rooms. . . . These restrictions ordinarily apply uniformly to all residents of all dwelling units," id. p. 733. Referring to zoning ordinances, the court said, "rules that cap the total number of occupants in order to prevent overcrowding of a dwelling `plainly and unmistakably' . . . fall within § 3607(b)(1)'s absolute exemption from the (Fair Housing Act's) governance; rules designed to preserve the family character of a neighborhood, fastening on the composition of households rather than on the total number of occupants living quarters can contain, do not," id. p. 735, cf. analysis in Fair Housing Advocates v.City of Richmond Heights, 209 F.3d 626 (CA. 6, 2000). A zoning ordinance cannot be reasonable under § 3607(b)(1) if despite its maximum occupancy restrictions it effectuates such restrictions only as they apply to "families" of a particular type or composition. Restrictions of this type are suspect since they indicate the purpose of the ordinance was not related to concerns about overcrowding which is the reason why Congress created the exemption in the first place.
The court can ascertain no rational reason why the same interpretation as given to § 3607(b)(1) should not apply to our subsection (9)(c) of § 46a-64c.
With the reasoning of Edmonds in mind, it would appear that the zoning ordinance here is not "reasonable" in the sense used in state and federal statutes. Under the ordinance a group" of not more than four people not related by blood or marriage can be considered a "family." A mobile home is a dwelling unit and can be occupied by a "family." There is a limitation as to four people as to such a "family." But if the individuals wishing to live in a dwelling unit are related by blood or marriage, there is a apparently no limit on the number of people who can constitute such a family. This is what Edmonds calls a "family composition", ordinance, not one concerned solely with maximum occupancy considerations. CT Page 9685
The town ordinance provides no justification for the defendant's policy or actions in this case. In language applicable to this claim of exemption as well as to all the other such claims relied upon by the defendants, the following language from the City of Richmond Heights case is instructive. There, the court was ruling on the validity of housing codes of the defendant cities and said:
 "Federal courts have repeatedly concluded that the part claiming the exemption `carries the burden of proving its eligibility for the exemption' and that `exemptions from the (Fair Housing Act) are to be construed narrowly, in recognition of the important goal of preventing housing discrimination'. . . . 209 F.3d at p. 634.
At page 635, the court, following this reasoning, also held that as regards matters like zoning ordinances, "cities are not entitled to the presumption of validity where they attempt to invoke an exemption under the (Fair Housing Act). . ." The defendants have not met the necessary test for relying on this ordinance of the Town of Groton to exempt themselves from operation of the state or federal Fair Housing Acts.[3]
 (b.)
The defendants also argue that state and federal law precluded the proposed occupancy in this case. The defendant cites a section of the Groton Town Code which states that if a provision of the town conflicts with a state law or regulation, "the provision which establishes the higher standards for the promotion and protection of the safety and the health of the people shall prevail," § 9-106 of town code. The defendants then cite the Council of American Building Officials One and Two Family Dwelling Code (CABO), which at § 103.1, states that "compliance with the requirements of (CABO) may be considered as prima facie evidence of compliance with the locally adopted code." CABO is now part of the state building code.
The defendants argue that under CABO a "building" is "any . . . family dwelling . . . which is used for human habitation." A family is said to be "an individual, two or more persons related by blood, marriage or law, or a group of not more than any five persons living together in a dwelling unit." CABO defines a dwelling as "any building which contains a dwelling unit . . . occupied for living purposes and a mobile home is considered a manufactured home, CABO § 202. From this, the defendants argue at page 16 of their initial brief:
 "A total of six unrelated people living in the CT Page 9686 plaintiff's mobile home would violate the state CABO code. CABO states that `A manufactured home shall be limited in use to use as a single dwelling unit,' CABO Appendix A, § A401. Since Mr. Cirrito and Ms. Michaud were not married, they were not a family according to the CABO definition, supra."
The plaintiff argues that the mobile home that the applicants sought to purchase was built in 1971 and an addition was constructed in 1975. An affidavit by the Deputy State Building Inspector, Mr. Tierney, states that the applicable building code was the one in force from 1971 to 1981 and the CABO code was not part of the state building code in 1971 or 1975. The defendants try to rebut this position by arguing that the applicable codes would be those in effect at the time of the allegedly discriminatory decision. Here, that was in 1997 and at that time the CABO provision just referred to was in effect. But Mr. Tierney in his affidavit indicates that the "particular state building code applicable to any given structure depends upon the date the structure was first erected . . . any subsequent changes or additions to the building are subject to the state building code provisions in effect at the time a permit for construction is applied for." In fact, Mr. Tierney says that the CABO provisions referred to above were not part of the state building code until 1999. Furthermore, the defendants have submitted the affidavit of Kevin Quinn, a Groton zoning official responsible for the enforcement of state and local building and zoning codes. He states that he enforces "BOCA and CABO codes in effect, regardless of when each dwelling in the town was built. Existing buildings do not necessarily have to come up to code but changes would have to come up to code." This, in effect, supports the plaintiff's position and also makes the defendants' reliance on § 21-68a of the General Statutes unconvincing. That statute says:
 "In the event of resale or resiting of a mobile or manufactured home, the local building official in the town where the mobile manufactured home is to be located shall, upon the request of either party, inspect the unit and shall issue a certificate of approval . . . or a certificate of occupancy . . . provided such authority finds such unit safe for human habitation and the site meets local zoning requirements."
Mr. Quinn's just quoted comment seems to indicate this statute does not require zoning ordinances containing current BOCA or CABO provisions be applied to mobile home units at the time an inspection is made under the statute.[4]
CT Page 9687
It would appear then that the references CABO provision does not apply here as being part of applicable local or state ordinances or regulations.
However, even if this analysis is incorrect, there are problems with the CABO provision. The defendants by relying on CABO's inclusion in local zoning or state regulations rely on the previously discussed provision in state law analogous to § 3607(b)(1) of the federal Fair Housing Act. Section 46a-64 (c) states: "Nothing in this section limits the applicability of any reasonable state statute or municipal ordinance restricting the number of persons permitted to occupy a dwelling." The problem with the CABO provision is the same problem as presented by the Groton zoning ordinance purporting to limit the number of occupants which has previously been discussed. Under the CABO provision, there appears to be no limit on the number of people who may reside in a unit of they are related by blood, marriage or law — if that criteria cannot be met, however, there is a limit of five people who may live in a unit. Why are the health and safety concerns raised by the number of unrelated people living together not raised by more traditional families with the same or more people. Provisions like § 46a-64 (c) and § 3607 (b)(1) cannot be used to regulate family composition. As the City ofRichmond Heights case notes, the burden rests upon the party claiming an exemption to the Fair Housing Act to establish the exemption and no presumption of validity may be given to an ordinance just because it is in the zoning code, 209 F.3d at pages 634-635. In the City of RichmondHeights case, the court held the defendant had "presented convincing evidence that the ordinances were enacted to protect health and safety by preventing dwelling overcrowding, not to impermissibly limit the family composition of dwellings," 209 F.3d at p. 636. Given the facial problems with the CABO provisions on that score, the defendants cannot rely on them to claim an exemption under § 46a-64 (c) or § 3706(b)(1) and thus a justification for the action they took with regard to the Cirrito application based on a purported reliance on CABO.
 (c.)
The defendants next rely on a claim that a total of six people living in the mobile home here would violate the Building Officials Code Administrators National Building Code of 1996 (BOCA) which was adopted as the state building code by statute, § 29-253. Under BOCA, each resident must have 200 square feet gross floor area to gain access to an exit. Under occupant load standards established by BOCA, six people then would require a total of 1,200 square feet, to meet BOCA provisions. The mobile home in question only had 1,100 square feet. The state and federal Fair Housing statutes are "subordinate" to state occupancy laws argue the defendants pursuant to the provisions of the often referred to statutory CT Page 9688 subsections of the state (§ 46a-64 (c)) and federal (§ 3707 (b)(1) Fair Housing Laws.
The defendants note HUD policy is in accord and cite the so-called Keating Memorandum issued by HUD which basically parrots § 3707 (b)(1) and its "reasonable" requirement for state occupancy limitations. It says if state or local occupancy requirements govern a dwelling and the housing provider's occupancy policies reflect those requirements "HUD would consider the governmental requirements as a special circumstance tending to indicate that the housing provider's occupancy policies are reasonable." This cannot be read. to change the requirement that the part asking for an exemption has the burden of establishing its right to it nor can it mean that local or state occupancy provisions are given presumptive validity, see City of Richmond Heights, supra. This just sets forth the modus operandi of a federal agency in fulfilling its responsibilities in enforcing the federal Fair Housing Act and is not binding on federal or certainly state courts in shifting burdens of proof or even explanation where a § 3607(b)(1) exemption claim is being made or on the state level an exemption claim under § 46a-64 (c).
The same arguments made as to CABO are made by the plaintiff as to BOCA. As to the latter, it is said in 1972 when the home was built and 1975 when an addition was added to it, the BOCA code was not in force; in fact, the 1996 BOCA code was not incorporated into the state building code until 1999, two years after the alleged discriminatory act. The court has previously discussed the Tierney and Quinn affidavits and will not repeat that discussion. The court for the reasons stated as to CABO concludes that the BOCA standards referred to cannot be considered part of any state building code or appropriately incorporated in any local zoning ordinance applicable to this case.
It should be said that if the court is wrong in this analysis, the same problems concerning the facial invalidity of the CABO provision do not apply to the BOCA square foot provision. Square feet provisions apply uniformly to all residents of all dwellings. In fact, the City ofRichmond Heights court held that the defendant city met its burden that its occupancy limitation provision based on square feet criteria exempted its actions under the federal Fair Housing Act pursuant to § 3607 (b)(1), 209 F.3d at page 636. But evidence was offered in that case not offered here wherein the defendant city did not rely on the presumptive validity of its square foot occupancy provision but "presented convincing evidence that the ordinances were enacted to protect health and safety by preventing dwelling overcrowding not to impermissibly limit the family composition of dwellings" and also other experts testified that there were several options for determining maximum occupancy requirements — a minimum square feet per person standard; a minimum number of CT Page 9689 square feet per bedroom per person standard, and a two-person per bedroom standard," id. p. 636. The court concluded the city could choose any of these options given the expert testimony. There has been no evidence or expert opinion evidence submitted attesting to the reasonableness of BOCA standards as applied to mobile homes even if that code were held to be incorporated in local and state regulations applicable to this case.
 (d.)
Finally, the defendants point to the federal Manufactured Home Construction and Safety Standards (MHCSS) which it is claimed are incorporated in state CABO regulations. Under MHCSS standards as to rules of occupancy "every manufactured home shall have at least one living area with not less than 150 square feet of gross floor area,24 C.F.R. § 3280.109 (a). Under the rules, the mobile home's living area cannot be used as a sleeping room. MHCSS provisions make a distinction between sleeping and living areas based on ingress and egress requirements. The defendants argue here the mobile home's living room does not meet HUD ingress and egress requirements to be considered a sleeping room.
The problems are manifold with the defendants' reliance on MHCSS standards. The defendants concede these standards are manufacturing not occupancy standards so the exemption provision of § 3607(b)(1) and by analogy of § 46a-64 (c) if they were incorporated into CABO would not apply. Also these standards only apply to mobile homes on privately owned property not, as here, rental property. It is not clear when these standards, which appear to be inapplicable to this case, were even incorporated into CABO relative even to the discriminatory acts alleged and the MHCSS standards referred to went into effect as manufacturing standards in 1975, three years after this mobile home was built.
Besides, as to these MHCSS standards or in fact as to the CABO and BOCA provisions we have been just discussing the defendants cannot reference these regulations as providing a legitimate or bona fide basis for actions which, for the purposes of this motion, are conceded to have a disparate discriminatory impact. At page 5 of its reply brief, the defendants argue that: "It is inherently reasonable for mobile park owners to be guided by the federal standards and other law in setting park rules and regulations." But the mere existence of the regulations does not establish they are reasonable or rationally related to concerns over health and safety brought about by overcrowding, which a defendant can thus rely on to justify its actions. Evidence and analysis based on such evidence must be offered to establish whether the justification offered for discriminatory action is legitimate, that is reasonable under all the circumstances. CT Page 9690
 V.
In light of the fact that the court has concluded that the defendants have not rebutted for summary judgment purposes the prima facie case of disparate impact on the basis of business necessity justification or justification based on the claimed dictates of local, state and federal ordinances, codes and regulations, there are several matters raised by the parties which the court will not decide and has not factored into its opinion.
The defendants refer to a number of regulations regarding watering of lawns, number of cars, ownership of pets, admonition as to water use. They argue that these regulations reflect a concern over the fact that "septic and water flow requirements mandate that the lots not be overcrowded;" the section of the brief referring to the engineer's report on the septic system is then mentioned. (See p. 7 of September 5, 200 brief.) But this is a disparate impact, not a disparate treatment case. Even if the defendants had an honest "concern" over the capacity of the septic system's capacity, this cannot translate itself into a business necessity justification without evidence to indicate the concern was warranted. Similarly, the plaintiff, in its first brief, cites what it alleges to be "actions prior to and after enactment of Fair Housing Amendments of 1988 probative of evidence of discrimination." The amendments referred to familial status and the "actions" mentioned by the plaintiff are 1978 park rules limiting the number of children, park rules showing there is an extra monthly charge currently assessed for children. The plaintiff refers to a statement in U.S. v. Lepore,816 F. Sup. 1011, 1017 (M.D.Pa., 1991) that "the United States Supreme Court has stated that "evidence of historical discrimination is relevant to drawing an inference of purposeful discrimination. . ." But Lepore was a disparate treatment case alleging "discriminatory intent," id. p. 1017. This is a disparate impact case. Intent may become relevant to rebut any justification defense after a prima facie case has been established as previously indicated but query how relevant such evidence is on that score in a case such as this where the justification defense involves reliance on an engineer's report and local, state and federal ordinances, codes and regulations.
In other words, would the technical findings of an engineer hired by the defendants be subject to impeachment because of past or current acts of discrimination having nothing to do with the preparation of the report? Would the court be persuaded to alter its interpretation of governmental ordinances, codes and regulations relied on by the defendants based on prior or discriminatory acts? The answer must be no. CT Page 9691
What about the fact that, in the original reason advanced by the defendants for denying the Cirrito application, the septic tank problems were not raised. If the septic tank justification were valid that would not necessarily prevent the defendants from relying on it at least on the question of the ambit of any remedy but query whether it would totally defeat the fair housing cause of action if the reasons for the action initially given were found not to be supportable, cf. McKinnon v.Nashville Banner Publ. Co., 513 U.S. 352 (1994) (after — acquired evidence of employee's wrongdoing). Reasoning by way of analogy fromMcKinnon may not be appropriate in a disparate impact case as opposed to a case like McKinnon which involved allegations of intentional wrongdoing regarding age discrimination. The court does not factor the reasoning ofMcKinnon into its decision, it was really not directly raised by the parties.
The court will also not discuss that subset problem of the business necessity defense — were there alternative methods of accomplishing the same goals, here preserving the septic system, which would not have the disparate impact on families with children caused by the occupancy provision in question? Alternatives need be examined only if the business necessity justification is sufficiently established in a summary judgment setting, so as to shift the burden of explanation back to the plaintiff. The court has concluded that has not been done here. In any event, the motion for summary judgment is denied.
Corradino, J.