IN THE SUPREME COURT OF TEXAS
 
════════════
No. 10-0245
════════════
 
Patrick O. Ojo, On 
Behalf of Himself and
All Others Similarly Situated, 
Appellant
 
v.
 
Farmers Group, Inc., Fire Underwriters 
Association,
Fire Insurance Exchange, Farmers Underwriters 
Association,
and Farmers Insurance Exchange, Appellees
 
════════════════════════════════════════════════════
On Certified Question from the United 
States
Court of Appeals for the Ninth 
Circuit
════════════════════════════════════════════════════
 
 
Argued October 14, 
2010
 
            
Justice Green delivered the 
opinion of the Court, in which Chief 
Justice Jefferson, Justice Wainwright, Justice Medina, Justice Johnson, Justice Guzman, and Justice Lehrmann joined, and in which 
Justice Willett joined as to Parts 
I, II, III.A–B, IV, and V.
 
            
Chief Justice Jefferson 
filed a concurring opinion. 

            
Justice Willett filed an opinion concurring in part.
            
Justice Hecht did not 
participate in the decision.
 
 
            
The United States Court of Appeals for the Ninth Circuit certified to this Court 
the following question:
Does Texas 
law permit an insurance company to price insurance by using a credit-score 
factor that has a racially disparate impact that, were it not for the 
[McCarran-Ferguson Act],[1] would violate the federal Fair Housing 
Act, 42 U.S.C. §§ 3601–19, absent a legally sufficient nondiscriminatory 
reason, or would using such a credit-score factor violate Texas Insurance Code 
sections 544.002(a), 559.051, 559.052, or some other provision of Texas law?
 
Ojo v. 
Farmers Group, Inc., 600 F.3d 1201, 1204–05 (9th Cir. 2010) (en banc) (per 
curiam).  Pursuant to Article 5, section 
3-c of the Texas Constitution and Texas Rule of Appellate Procedure 58.1, we 
answer that Texas law prohibits the use of race-based credit scoring, but 
permits race-neutral credit scoring even if it has a racially disparate 
impact.
I.  Introduction
            
Patrick Ojo, an African-American resident of Texas, 
carries a homeowner’s property-and-casualty insurance policy issued by Farmers 
Group, Inc.  Id. at 1202.  Although 
Ojo has never made a claim on his homeowner’s policy, 
Farmers raised Ojo’s insurance premium by nine 
percent.  Id.  Ojo alleges that 
Farmers increased the premium as a result of unfavorable credit information 
acquired though its automated credit-scoring system.  Id.
            
On behalf of himself and other racial minorities whose premiums increased as a 
result of Farmers’ use of a credit-scoring system, Ojo 
sued Farmers and its affiliates, subsidiaries, and reinsurers in federal 
court.  Id.  Ojo alleges that the 
defendants’ credit-scoring systems employ several “undisclosed factors” which 
result in disparate impacts for minorities and violate the federal Fair Housing 
Act (FHA), 42 U.S.C. §§ 3601–3619.  Ojo, 
600 F.3d at 1202.  Ojo 
does not assert that he or any other member of the putative plaintiff class has 
suffered intentional discrimination at the hands of the defendants.  
Id.
            
Citing Federal Rule of Civil Procedure 12(b)(1) and 
12(b)(6), the defendants moved to dismiss all of Ojo’s 
claims.  Id.  Applying the McCarran-Ferguson Act’s (MFA) 
reverse-preemption standard, 15 U.S.C. § 1012(b), the district court 
concluded that the Texas Insurance Code preempted Ojo’s FHA claims.  Id. at 
1203.  Accordingly, the district court declined to answer whether 
Ojo’s disparate-impact discrimination claim 
sufficiently complied with Federal Rule of Civil Procedure 12(b)(6).  Id. at 
1202.  On appeal to the United States Court of Appeals for the Ninth 
Circuit, a divided three-judge panel held that Texas law did not reverse-preempt 
Ojo’s FHA claim, initially reversing the district 
court.  Ojo v. Farmers Group, Inc., 565 F.3d 1175, 1178 (9th Cir. 
2009).  Subsequently, the Ninth Circuit ordered the case reheard en 
banc.  Ojo v. Farmers Group, Inc., 586 F.3d 1108, 1108 (9th Cir. 
2009).  The Ninth Circuit’s rehearing en banc resulted in the 
certified question now before us.  See Ojo, 600 F.3d at 1204–05. 
II.  Background
           
Ojo sued in federal court based on the FHA, under 
which it is unlawful “[t]o discriminate against any person in the terms, 
conditions, or privileges of sale or rental of a dwelling, or in the provision 
of services or facilities in connection therewith, because of race.”  42 U.S.C. § 3604(b).  Federal courts of appeals 
have interpreted this FHA provision to prohibit not just intentional acts of 
discrimination, but also race-neutral actions that have discriminatory effects 
on racial minorities (disparate-impact discrimination).[2]  Several courts of appeals have also 
held that the FHA applies in the underwriting of homeowner’s property insurance, 
given the FHA’s prohibition of discrimination “in the provision of services . . 
. in connection” with the “sale or rental of a dwelling.”  42 U.S.C. § 3604(b); see, e.g., Nationwide Mut. Ins. Co. v. 
Cisneros, 52 F.3d 1351, 1360 (6th Cir. 1995); 
NAACP v. Am. Family Mut. Ins. Co., 978 F.2d 287, 301 (7th 
Cir. 1992).  Ojo’s cause of 
action asserts this type of disparate impact liability in Farmers’ pricing of 
homeowner’s insurance based on credit scoring. 
            
Ojo’s disparate impact claim, however, may be 
“reverse-preempted” by Texas law under the MFA, which provides that “[n]o Act of 
Congress shall be construed to invalidate, impair, or supersede any law enacted 
by any State for the purpose of regulating the business of 
insurance, . . . unless such Act specifically relates to the 
business of insurance.”  15 U.S.C. 
§ 1012(b).  Under the MFA, state law reverse-preempts a federal 
statute if:  “(1) the federal law does not specifically relate to 
insurance; (2) the state law is enacted for the purpose of regulating insurance; 
and (3) the application of federal law to the case might invalidate, impair, or 
supersede the state law.”  Ojo, 600 
F.3d at 1208–09 (citing Humana Inc. v. Forsyth, 525 U.S. 299, 307 
(1999)).  The Ninth Circuit, hearing this case en banc, held that 
“it is undisputed that the FHA does not specifically relate to insurance,” thus 
satisfying the first prong of MFA reverse-preemption.[3]  Id. at 1203.  It is 
also undisputed that “the relevant provisions of Texas law . . . are enacted for 
the purpose of insurance regulation,” thus satisfying the second prong.  
Id.  The certified question before us specifically deals with the 
third prong, and asks whether allowing Ojo’s claim 
under the FHA might invalidate, impair, or supersede Texas law.  See id. 
at 1204–05.  In light of the fact that Texas 
only prohibits the use of credit score factors or rates based on race, or 
rates that differ because of race, we answer that application of the FHA 
to permit a cause of action for disparate impact resulting from the use of 
credit scoring in the field of insurance certainly might invalidate, impair, or supersede Texas 
law.
III.  The Texas Insurance Code Does Not Provide for a Cause 
of Action
Based on a 
Racially Disparate Impact
 
            
The Texas Insurance Code expressly prohibits “unfair discrimination” and 
specifically states that “[a] person may not charge . . . an individual a rate 
that is different from the rate charged to other individuals for the same 
coverage because of the individual’s race, color, religion, or national 
origin.”  Tex. Ins. Code § 
544.002(a)(2).  An exception to this provision 
provides that “[a] person does not violate Section 544.002 if the refusal, 
limitation, or charge is required or authorized by law or a regulatory 
mandate.”  Id. § 544.003(c).  Farmers 
points out that § 559.051 authorizes the use of race-neutral credit score 
factors, and that this authorization is the exception to § 544.002,which is  recognized in § 544.003.  Section 
559.051 permits an insurer to “use credit scoring, except for factors that 
constitute unfair discrimination, to develop rates, rating classifications, or 
underwriting criteria.”  Id. § 559.051; see also id. 
§ 559.052(a)(1) (“An insurer may not use a 
credit score that is computed using factors that constitute unfair 
discrimination . . . .”).  The factors that “constitute unfair 
discrimination” are not defined in the Texas Insurance Code.  However, the 
Code does define an “unfairly discriminatory” rate as one that “is based 
wholly or partly on the race, creed, color, ethnicity, or national origin of 
the policyholder or an insured.”  Id. § 560.002(c)(3)(C) (emphasis added).
            
Under Texas Insurance Code § 559.201, the use of credit score factors defined by 
§ 559.052(a)(1) that constitute “unfair 
discrimination” is deemed an “unfair practice in violation of Chapter 
541.”  Id. § 559.201 (making violations of Chapter 
559 an unfair practice under Chapter 541).  Unfair practices under 
Chapter 541 are subject to private civil suits, including class actions.  
Id. §§ 541.151 (Private Action for Damages Authorized), 541.251(a) (Class 
Action Authorized); see Farmers Group, Inc. v. Lubin, 222 S.W.3d 417, 421–22 (Tex. 2007).
            
No Texas courts have interpreted whether these Insurance Code provisions 
prohibit only intentional discrimination or also discrimination based on 
disparate impact.  We derive from these provisions that insurance rates may 
not be “based wholly or partly on” race, and that an individual may not be 
charged a rate that is “different from the rate charged to other individuals for 
the same coverage because of the individual’s race.”  
Tex. Ins. Code §§ 544.002(a)(1) (emphasis added), 560.002(c)(3)(C).  Additionally, 
while credit scoring is authorized, it may not be based on “factors that 
constitute unfair discrimination.”  Id. §§ 559.051, 559.052(a)(1).  We can only assume that a credit score  factor constitutes unfair discrimination 
if it is “based wholly or partly on” race, or if it is used to arrive at an 
insurance rate that is “different from the rate charged to other individuals for 
the same coverage because of the individual’s race.”  
See id. §§ 544.002(a)(1), 
560.002(c)(3)(C).  Ojo alleges these provisions 
not only prohibit intentional discrimination—the use of race-based 
classifications to price insurance differently—but also prohibit disparate 
impact discrimination—the use of race-neutral pricing schemes that effectuate 
disparate results (in this case, racial minorities alleging they have suffered 
higher premium rates as a direct consequence of race-neutral credit 
scoring).  However, nothing in the Insurance Code prohibits the use of 
race-neutral credit scoring.  In fact, the Code requires that the factors 
used in credit scoring to price insurance be race-neutral, or not based 
on race.  See id. §§ 544.002(a)(1), 560.002(c)(3)(C). The nature of Ojo’s disparate impact claim presupposes that these factors 
are race neutral, which is exactly what the Code requires.  Nevertheless, 
to support his argument that the “based on” and “because of” race language in 
the Texas Insurance Code implies the availability of a cause of action for 
disparate impact discrimination, Ojo draws our 
attention to the same language used in the FHA, an act which has been 
interpreted to provide for disparate impact protection.  See 42 
U.S.C. § 3604; see, e.g., City of Black Jack, 508 F.2d at 
1184.  Ojo also relies on the United States 
Supreme Court’s interpretation of Title VII of the Civil Rights Act as providing 
for a disparate impact cause of action, an act that also prohibits 
discrimination “because of” race.  See 42 U.S.C. § 2000e-2; Smith 
v. City of Jackson, 544 U.S. 228, 240 (2005); Griggs v. Duke Power 
Co., 401 U.S. 424, 436 (1971).  However, given the numerous other 
considerations, addressed below, that have led federal courts to broadly 
interpret the FHA and Title VII, we find this argument unavailing.  We are 
also guided by the fact that the use of the “because of” race and “based on” 
race language in Texas case law and the Texas Labor Code has been more in 
association with intentional discrimination claims than claims for disparate 
impacts.  We first address the use of this language within Texas statutes 
and case law.
A.  The 
Language of the Insurance Code Is Inconsistent
with a Disparate Impact Theory 
of Liability
            
The Texas Insurance Code prohibits “unfairly discriminatory” insurance rates as 
those that charge differently “because of” or “based wholly or partly on” 
race.  See Tex.  Ins.  Code §§ 544.002(a)(1), 560.002(c)(3).  Texas courts considering this 
language in the employment context have used the “because of” and “based . . . 
on” race language in the disparate treatment context, but not in the area of 
disparate impacts.  In University of Texas v. Poindexter, 306 S.W.3d 
798 (Tex. App.—Austin 2009, no pet.), the court of appeals held that “[d]isparate-treatment discrimination addresses employment 
actions that treat an employee worse than others based on the employee’s 
race, color, religion, sex, or national origin.  In such 
disparate-treatment cases, proof and finding of discriminatory motive is 
required.”  Id. at 804 n.1 (emphasis added); accord Massarsky v. Gen. Motors Corp., 706 F.2d 111, 
117 (3d Cir. 1983) (noting that a plaintiff could establish intentional 
discrimination when his “employer applied an expressly race-based or 
sex-based standard in its treatment of the plaintiff” (emphasis 
added)).  In Wal-Mart Stores, Inc. v. Davis, 979 S.W.2d 30 
(Tex. App.—Austin 1998, pet. denied), the court of appeals described disparate 
impact claims as ethose that “involve facially neutral 
practices . . . that operate to exclude a disproportionate percentage of persons 
in a protected group and cannot be justified by business necessity. . . .  
Disparate treatment [exists where] the defendant . . . treats some people less 
favorably than others because of their race, color, religion, sex, or 
national origin.”  Id. at 44 (emphasis added).  The United 
States Supreme Court has similarly distinguished between disparate treatment 
discrimination and disparate impact discrimination, noting that the former is 
discrimination against others “because of their race,” while the latter 
encompasses “practices that are facially neutral . . . but that in fact fall 
more harshly on one group than another.”  Int’l Bhd. of Teamsters v. 
United States, 431 U.S. 324, 335–36 n.15 (1976); see also 
Smith, 544 U.S. at 239 (plurality opinion).
            
Significantly, the phrase “because of race” is also used in the Texas Labor 
Code, which makes an employer liable for taking action adverse to an employee 
“because of race.”  See Tex. 
Lab. Code § 21.051.  Under the 
Labor Code, a plaintiff must show causation by demonstrating that race was a 
motivating factor in the employer’s decision, the standard for proving 
intentional discrimination, or disparate treatment.  See id. § 
21.125(a) (“Except as otherwise provided by this chapter, an unlawful employment 
practice is established when the complainant demonstrates that race . . . was a 
motivating factor for an employment practice, even if other factors also 
motivated the practice . . . .”); cf. Quantum Chem. Corp. 
v. Toennies, 47 S.W.3d 473, 480 (Tex.  2001) 
(holding that in a claim for age discrimination, an employee must show that age 
was a motivating factor in the employer’s decision to terminate the employee); 
Herbert v. City of Forest Hill, 189 S.W.3d 369, 375 (Tex.  App.—Fort Worth 2006, no pet.)  (holding that to prove causation in a race discrimination 
case, a plaintiff “must establish that race was a motivating factor for [the] 
employment practice” (internal quotation marks omitted)).  In addition, the Texas Legislature expressly 
provided for disparate impact protection in Texas Labor Code 
§ 21.122(a)(1),[4] where it 
defined the burden of proof for disparate impact cases in the employment 
context:
An unlawful employment practice based on disparate 
impact is established under this chapter only if a complainant demonstrates that 
a respondent uses a particular employment practice that causes a disparate 
impact on the basis of race . . . and the respondent fails to demonstrate that 
the challenged practice is job-related for the position in question and 
consistent with business necessity . . . .
 
Id.  
No such section appears in the Texas Insurance Code.  The Texas 
Legislature, well aware of how to create a cause of action for disparate impact 
discrimination, chose not to do so in the field of insurance, specifically with 
regards to the use of credit scoring.[5]  Because the Legislature chose not 
to include a section expressly providing for or defining a disparate impact 
claim in the Texas Insurance Code, but did do so in the Texas Labor Code, we 
conclude that the Legislature did not intend to provide for disparate impact 
liability for the use of credit scoring in pricing insurance.
B.  The Use 
of “Because of” Race in the Federal FHA and Title VII
Did Not Alone 
Prompt Federal Courts to Hold That These Acts
Create Causes of 
Action Based on Racially Disparate Impacts
 
            
Ojo relies on federal case law interpreting the FHA 
and Title VII to provide for disparate impact protection, arguing that the Texas 
Insurance Code should also be interpreted to provide for disparate impact 
protection because it uses the same “because of race” language as those federal 
acts.  See 42 U.S.C. § 2000e-2 (prohibiting discrimination by 
employers of individuals “because of such individual’s race” 
); 42 U.S.C. § 3604(b) (prohibiting discrimination in the provision of 
services in connection with housing “because of race”); Tex. Ins. Code § 544.002(a) (defining unfair discrimination as 
providing insurance coverage differently “because of the individual’s . . . 
race”).  Although Ojo has 
pointed us to a wealth of federal authority holding that the FHA and Title VII 
provide for disparate impact protection, the reasons supporting those holdings 
extend far beyond the use of the phrase “because of race.”  See, e.g., Metro. Hous. Dev. 
Corp. v. Vill. of Arlington Heights, 558 
F.2d 1283, 1289 (7th Cir. 1977) (focusing on the policy goals of the FHA in 
deciding on a broad interpretation of its provisions); see also Peter E. 
Mahoney, The End(s) of Disparate Impact: Doctrinal Reconstruction, Fair 
Housing and Lending Law, and the Antidiscrimination Principle, 47 Emory L.J. 409, 425 (1998) (describing 
the origins of the disparate impact standard under the FHA as partially 
“borrowed” from the case law on Title VII, and also noting the standard’s 
diverse and inconsistent application by federal courts).  In determining 
whether a statute provides for disparate impact protection, federal and state 
courts have looked first to the language of the statute to assess whether “the 
thrust of the Act [is] to the consequences of . . . practices, not simply the 
motivation.”  Griggs, 401 U.S. at 432; see also Tex. Parks & 
Wildlife Dep’t. v. Dearing, 240 S.W.3d 330, 352 (Tex.  App—Austin 2007, pet. denied).  
The United States Court of Appeals for the Seventh Circuit actually regarded the 
phrase “because of race” as a potential obstacle to disparate impact protection 
before considering the policy goals behind the FHA:
            
The major obstacle to concluding that action taken without discriminatory intent 
can violate section 3604(a) is the phrase 
“because of race” contained in the statutory provision.  The narrow view of 
the phrase is that a party cannot commit an act “because of race” unless he 
intends to discriminate between races. . . . The broad view is that a party 
commits an act “because of race” whenever the natural and foreseeable 
consequence of that act is to discriminate between races, regardless of his 
intent.
 
Vill. of Arlington Heights, 558 F.2d at 1288; 
accord Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 146 (3d Cir. 
1977) (“[W]e note that the ‘because of race’ language 
might seem to suggest that a plaintiff must show some measure of discriminatory 
intent.”).  The Seventh Circuit declined to take a narrow view of the 
“because of race” language because of the congressional mandate within the FHA 
“to provide, within constitutional limitations, for fair housing throughout the 
United States.”  Vill. of Arlington 
Heights, 558 F.2d at 1289 (quoting 42 U.S.C. § 3601).  The 
Seventh Circuit also relied on previous interpretations of the FHA, and its goal 
to “promote ‘open, integrated residential housing patterns and to prevent the 
increase of segregation, in ghettos, of racial groups whose lack of 
opportunities the Act was designed to combat.’”  Id. 
(quoting Otero v. N.Y. City Hous. 
Auth., 484 F.2d 1122, 1134 
(2d Cir.  1973)).  Other 
federal circuit courts applying disparate impact protections under the FHA have 
also relied upon this congressional mandate.[6]  Numerous courts have also noted 
that the need for disparate impact protection under the FHA arose from the lack 
of disparate impact liability under the Fourteenth Amendment after the United 
States Supreme Court’s decision in Washington v. Davis, 426 U.S. 229 
(1976), and the difficulty of proving intentional discrimination.[7] 
            
In determining whether discriminatory impact liability exists within the FHA, 
Title VII, and the Age Discrimination in Employment Act (ADEA), state and 
federal courts have also focused on the breadth and reach of prohibitory 
language, and have refused to find disparate impact liability when a statute 
focuses only on the nature of an action, and not on its effects.  See, 
e.g., Monson v. Rochester Athletic Club, 759 N.W.2d 60, 67 (Minn. Ct. 
App. 2009) (holding that there was no disparate impact liability where “the 
[state law] does not include such effects-based language”); see also 
Smith, 544 U.S. at 235–36 (holding that the ADEA provides for disparate 
impact liability because it not only prohibits employers’ actions that “limit, 
segregate, or classify” persons, but rather, also prohibits actions that 
“deprive any individual of employment opportunities or otherwise adversely 
affect his status as an employee” (citing 29 U.S.C. § 623(a))); 
Dearing, 240 S.W.3d at 339 (quoting Smith, 544 U.S. at 235).  
Both Title VII and the ADEA have been interpreted by the United States Supreme 
Court to provide for disparate impact liability because they go so far as to 
prohibit practices that “tend to deprive employees of opportunities.”  
See Smith, 544 U.S. at 235–36 (ADEA); Griggs, 401 U.S. at 
430–32 (Title VII); see also Huntington, 488 U.S. at 18 (declining to 
determine whether the FHA provides for disparate impact protection, stating: 
“Since appellants conceded the applicability of the disparate-impact test for 
evaluating the zoning ordinance under Title VIII, we do not reach the question 
whether that test is the appropriate one.”).
            
Sections 544.002(a) and 560.002(c)(3) of the Texas 
Insurance Code do not include the type of broad prohibitory language that gives 
rise to disparate impact claims.  Rather, both sections focus exclusively 
on the manner in which insureds are classified; that 
is, they prohibit classifications because of or based on 
race.  Neither statute broadens its application so as to prohibit 
practices that may “otherwise adversely affect” or “tend to deprive” an insured 
of an opportunity, or any other similarly expansive language, as was the case in 
the federal acts at issue in Griggs and Smith.  See 
Smith, 544 U.S. at 235–36 (ADEA); Griggs, 401 U.S. at 430–32 
(Title VII).  Rather, the Texas Insurance Code authorizes actions that 
classify individuals based on credit score in order to affect insurance pricing, 
as long as such classifications are not based on race or because of race.  
See Tex. Ins. Code §§ 
544.002(a), 559.051, 560.002(c)(3).  As long as 
insurers use race-neutral factors in credit scoring to set insurance rates, they 
do not run afoul of the Texas Insurance Code in the way an employer would run 
afoul of Title VII for using race-neutral testing that adversely affects 
employees of a certain race.  See Griggs, 401 U.S. at 430 (“Under 
[Title VII], practices, procedures or tests neutral on their face, and even 
neutral in terms of intent, cannot be maintained if they operate to ‘freeze’ the 
status quo of prior discriminatory employment practices.”).  Because the 
Texas Insurance Code expressly authorizes credit scoring, it cannot be subject 
to the same breadth of interpretation applied to Title VII or the FHA simply 
because it uses the phrases “because of” or “based . . . on” race.  Ojo’s argument that federal interpretations of these acts 
should control our interpretation of the Texas Insurance Code is unavailing in 
light of the additional considerations, other than some similar language, 
present in the federal case law.
C.  The 
Legislative History of the Insurance Code Is Inconsistent
with a Disparate Impact Theory of Liability
 
            
In addition to the express language 
of the statute, courts have looked to a statute’s legislative history when 
determining whether the statute gives rise to a disparate impact theory of 
liability.  See, e.g., Smith, 544 U.S. at 238 (“[W]e think the history of the enactment of the ADEA . . . supports 
the . . . consensus concerning disparate-impact liability.”); Gen. Bldg. 
Contractors Ass’n, Inc. v.  Pennsylvania, 458 
U.S. 375, 389 (1982) (examining the legislative history of 42 U.S.C. § 1981 and 
holding the statute did not give rise to a disparate impact claim); 
Griggs, 401 U.S. at 436 (“From the sum of the legislative history 
relevant in this case, the conclusion is inescapable that the [agency’s] 
construction . . . comports with congressional intent.”); Dearing, 240 
S.W.3d at 351 (“When ascertaining legislative intent, we may also consider . . . 
the law[’s] . . . history . . . .”); see also 
Tex. Gov’t Code 
§ 311.023(3) (allowing courts to consider legislative history 
when construing statutes).  We also look to 
legislative history in this instance because the declared policy of the MFA is 
to ensure that state legislatures are able to regulate the business of insurance 
without unintended federal interference.[8] 
            
The legislative history of the credit scoring bill and the arguments of its 
opponents indicates that the Texas Legislature was 
aware of the possibility of a disparate impact on racial minorities, yet did not 
expressly provide for a disparate impact claim as it did in the Texas Labor 
Code.  Despite its longstanding prohibition 
of unfair discrimination, the Legislature first expressly authorized the use of 
credit scoring in setting insurance rates in 2003.  Act of June 2, 
2003, 78th Leg., R.S., ch. 206, § 3.01, 2003 Tex. 
Gen. Laws 916, 916–21, repealed by Act of May 24, 2005, 79th Leg., R.S., 
ch. 728, § 11.020(b), 2005 Tex. Gen. Laws 2188, 
2217 (recodifying the relevant credit scoring sections 
of the Insurance Code into Tex. Ins. 
Code chapter 559) (originally codified at Tex. Ins. Code Ann. art. 21.49-2U, § 7(a) (West Supp. 
2003)).  Opponents of the credit scoring bill admonished:
The state 
should ban the practice of credit scoring altogether.  Tornadoes do not 
strike homeowners on the basis of their credit scores, and no independent 
studies have proven any statistical relationship between a consumer’s credit 
history and his or her ability to drive or maintain an automobile. . . .  
Credit scoring is discriminatory, especially against women, minorities, 
low-income consumers, and consumers who conduct all of their personal business 
on a cash basis.
 
House Research Org., Bill Analysis, Tex. S.B. 14, 78th 
Leg., R.S., 20 (May 21, 2003).  Despite those concerns, the 
Legislature decided to authorize credit scoring in pricing insurance, but 
addressed some of the concerns with certain statutory restrictions.  In addition to prohibiting the use of “factors that constitute 
unfair discrimination,” Tex. Ins. Code Ann. art. 21.49-2U, § 7(a) (West Supp. 2003) (current version at Tex. Ins. Code § 559.051), the Legislature 
prohibited insurers from denying, cancelling, or refusing to renew a policy 
“solely on the basis of credit information,” as well as from denying coverage 
solely because the consumer does not have a credit card account.  Id. § 3(a) (current version at 
Tex. Ins. Code § 559.052).  Also, 
certain information could not be used as a negative factor in an insurer’s 
scoring methodology, such as a collection account with a medical industry 
code.  Id. § 4(a)(3) (current version at 
Tex. Ins. Code § 559.101).  However, 
even with these restrictions, the Legislature included no language expressly 
providing for a cause of action based on disparate impact.
            
The Legislature also directed the Commissioner of the Texas Department of 
Insurance (TDI) to conduct a study and submit a report to state officials and 
the 79th Legislature before January 1, 2005, containing, among other 
things:
•                     
a summary statement regarding the use of credit 
information, credit reports, and credit scores by insurers . . . ;
 
 
•                     
any disproportionate impact on any 
class of individuals, including classes based on income, race, or ethnicity 
. . . ; and
 
•                     
recommendations from the department to 
the [L]egislature regarding the use of credit 
information by insurers.
 
Act of June 2, 
2003, 78th Leg., R.S., ch. 201, § 3.01, sec. 
15(a), (b)(1), (b)(5)–(6), 2003 Tex. Gen. Laws 916, 920–21 (expired Mar. 1, 
2005) (emphasis added) (previously located at Tex. Ins. Code Ann. art. 21.49-2U, § 15 (West Supp. 2003)).  Insurance 
Commissioner Jose Montemayor completed this credit 
scoring study and submitted his findings in December 2004, stating in part: 
Similar to 
other published studies,[9] there appears to be a strong relationship 
between credit score and insurance risk (or loss). . . .  [With regards to 
auto insurance,] as credit scores improve, the frequency decreases, i.e. people 
have fewer accidents or claims.
 
Tex.  Dep’t of Ins., Report to the 79th 
Legislature: Use of Credit Information by Insurers in Texas 18–20 (Dec. 
2004), http://www.tdi.state.tx.us/reports/documents/creditrpt04.pdf.  These 
findings were supplemented with a report to the Legislature, which explained 
that under a multivariate analysis:
For both 
personal auto liability and homeowners, credit score was related to claim 
experience even after considering other commonly used rating variables. . . 
.  For both personal auto liability and homeowners, the difference in 
claims experience by credit score was substantial.  Typically, the claim 
experience for the 10 percent of policyholders with the worst credit scores was 
1.5 to 2 times greater than that of the 10 percent of policyholders with the 
best credit scores.  The magnitude of the variation noted in the earlier 
report remains unchanged even after considering other commonly used rating 
variables.
 
Tex. Dep’t of Ins., Supplemental Report to the 
79th Legislature: Use of Credit Information by Insurers in Texas: The 
Multivariate Analysis 6 (Jan. 2005), 
http://www.tdi.state.tx.us/reports/documents/credit05sup.pdf.
            
In a letter accompanying the report, Commissioner Montemayor explained that while disparate impacts result 
from the use of credit scoring, he was without authority to ban or regulate the 
use of credit scoring that produces disparate impacts as long as it is 
actuarially sound and not intentionally discriminatory.[10]  Commissioner Montemayor stated that “credit scoring, if continued, is not 
unfairly discriminatory as defined in current law because credit scoring is not 
based on race, nor is it a precise indicator of one’s race.”  Letter from Jose Montemayor to the 79th Texas Legislature (Jan. 31, 2005) (accompanying Tex. Dep’t of Ins., Supplemental 
Report to the 79th Legislature: Use of Credit Information by Insurers in Texas: 
The Multivariate Analysis (Jan. 2005), 
http://www.tdi.state.tx.us/reports/documents/credit05sup.pdf).  
In addition, Commissioner Montemayor stated that the 
use of credit scoring in pricing insurance inevitably carried the risk of 
disproportionate impacts just as any risk-based assessment would, and that to 
discontinue insurers’ assessment of risk factors would effectively homogenize 
the risk and essentially charge everyone the same insurance rate, something that 
would “be a set-back to all Texans, of all races, especially those of moderate 
to lower income whose risk remains low.”  Id. 
            
“Even when a statute is not ambiguous on its face, we can consider other factors 
to determine the Legislature’s intent, including . . . administrative 
construction of the statute . . . .”  Helena Chem. Co. v. Wilkins, 
47 S.W.3d 486, 493 (Tex. 2001) (citing Tex. Gov’t Code § 311.023).  We cite the 
Commissioner Montemayor’s letter and report here, 
however, more for evidence of the Texas Legislature’s awareness of potential 
disparate impacts, and to show that the Legislature, knowing this, still chose 
not to expressly provide for disparate impact protection as it did in the Labor 
Code.  The Texas Legislature expressly directed the Commissioner to analyze 
the effects of credit scoring in insurance pricing and report back during the 
next legislative session.  It was during this subsequent session that the 
Legislature re-codified various portions of the Insurance Code, including the sections on credit scoring now codified 
at Texas Insurance Code chapter 559, and made no relevant changes to the Code, 
despite the Commissioner’s warnings of the potential for disparate 
impacts.  In fact, two bills banning credit scoring (H.B. 23 and S.B. 167), 
which were introduced by members of the 79th Legislature before the submission 
of Commissioner Montemayor’s January 2005 report, died 
in committee after the report was submitted.  See Tex. H.B. 23, 79th 
Leg., R.S. (2005); Tex. S.B. 167, 79th Leg., R.S. (2005).
            
Given the Legislature’s and the Insurance 
Commissioner’s awareness of the potential for disparate impacts, and the 
Legislature’s decision to not enact any express prohibition of disparate impact 
discrimination in the Insurance Code, we can only conclude that the Legislature 
did not intend to create a cause of action for disparate impact discrimination 
in insurance pricing based on credit scoring.
 
IV.  The Texas Fair Housing Act (TFHA) Does Not Change Our 
Conclusion
Regarding the Lack 
of Disparate Impact Liability in the Texas Insurance Code
 
            
The certified question also asks us to consider other provisions of Texas law 
that may provide for disparate impact protection.  Ojo argues that the Texas Fair Housing Act (TFHA) should 
provide such protection because the FHA, which the TFHA was intended to mirror, 
provides for disparate impact liability in the provision of housing.  
See Tex.  Prop.  
Code § 301.002(3) (“The purposes of this chapter are to provide rights 
and remedies substantially equivalent to those granted under federal  law.”).  Federal courts have interpreted the FHA 
to apply to the provision of homeowner’s insurance.  See, e.g., Am. Family Mut. Ins. Co., 978 F.2d 
at 299.  Ojo is correct that Texas courts 
will generally construe Texas statutes implementing federal rights consistently 
with federal case law.  See, e.g., Quantum Chem. Corp., 47 
S.W.3d at 476 (holding that the Texas Commission on Human Rights Act (TCHRA) was 
enacted to implement the policies of Title VII, and thus federal case law 
interpreting Title VII guides this Court’s reading of the TCHRA).  However, 
the TFHA contains a “carve-out” provision, which provides that provisions of the 
TFHA “do[] not affect a requirement of 
nondiscrimination in any other state or federal law.”  Tex.  Prop.  Code 
§ 301.044(b).  In 
addition, Ojo cannot direct us to, and indeed there is 
very little, federal authority confirming the existence of disparate impact 
liability even under the FHA in the field of insurance.  See, 
e.g., Saunders v. Farmers Ins. Exch., 537 F.3d 961, 964 (8th 
Cir. 2008) (“Applying [HUD] standards, we have recognized a disparate impact 
[FHA] claim against private actors in another context.  But at least with 
respect to insurers, the question is not free from doubt.  However, the 
Insurers have not raised the issue and therefore we assume, without deciding, 
that private insurers may be liable under the [FHA] on a disparate impact 
theory.” (internal citations omitted)); Dehoyos v. Allstate Corp., 345 F.3d 290, 299 
n.7 (5th Cir. 2003) (“We . . . decline to differentiate claims of disparate 
impact and claims of intentional discrimination at this preliminary stage of 
litigation”); Nationwide Mut. Ins. Co. v. 
Cisneros, 52 F.3d 1351, 1362 (6th Cir. 1995) (stating that “HUD has never 
applied a disparate impact analysis to insurers”); Allstate Fair Hous. Opportunities of Nw. Ohio v. Am. 
Family Mut. Ins. Co., 684 F. Supp. 2d 964, 
967–70  (N.D. Ohio 2010) (holding that plaintiffs failed to make a prima 
facie case of disparate impact discrimination regarding the use of a specific 
valuation method as an underwriting criterion).  Because the relevant 
provisions of the Texas Insurance Code are more recent and specific regarding 
discriminatory liability in the field of insurance, and because we have 
determined that the Insurance Code does not provide for disparate impact 
liability, we conclude that Ojo’s argument that Texas 
provides for disparate impact liability in the field of insurance under the TFHA 
lacks merit.
V.  
Conclusion
 
            
The Texas Insurance Code is void of any language creating a cause of action for 
a racially disparate impact.  The Texas Legislature has demonstrated that 
it is well aware of how to create a cause of action for disparate impact in 
other contexts, but it has chosen not to do so in the field of insurance.  
When dealing with issues of policy, this Court has consistently deferred to the 
judgment of the Legislature, and has not created causes of action where the 
Legislature did not clearly express a desire to do so.  See Edgewood 
Indep. Sch. Dist. v. Meno, 917 S.W.2d 717, 726 (Tex. 1995) 
(recognizing that it is not our responsibility “to judge the wisdom of the 
policy choices of the Legislature, or to impose a different policy of our own 
choosing.”).  The decision to either allow or prohibit the use of credit 
scoring in pricing insurance that creates disparate impacts properly rests with 
the Legislature, and we leave to the Legislature’s judgment the question of 
whether to expressly create a cause of action for disparate impact in the field 
of insurance, as it expressly created within the Texas Labor Code.  See 
Tex. Labor 
Code § 21.122(a)(1) (defining the burden of proof in asserting a 
cause of action for discrimination based on disparate impact).  Allowing a 
claim against Texas insurers for using completely race-neutral factors in credit 
scoring would frustrate the regulatory policy of Texas that the MFA is meant to 
protect, which is the continued regulation of the field of insurance by the 
states without unintentional congressional intrusion.  See 15 U.S.C. 
§§ 1011 (“[T]he continued regulation and taxation by the several States of the 
business of insurance is in the public interest . . . .”), 1012(b) (“No Act of 
Congress shall be construed to invalidate, impair, or supersede any law enacted 
by any State for the purpose of regulating the business of insurance, . . . unless such Act specifically 
relates to the business of insurance . . . .”).   Therefore, we answer 
the certified question by holding that Texas law does not prohibit an insurer 
from using race-neutral factors in credit-scoring to price insurance, even if 
doing so creates a racially disparate impact.
 
                                                                                    
______________________________
                                    
                                                
Paul W. Green
                                                                                    
Justice
 
OPINION DELIVERED:  May 27, 
2011    









[1] 
The McCarran-Ferguson Act (MFA) allows state 
insurance law to “reverse-preempt” federal law that does not directly relate to 
insurance.  See 15 U.S.C. § 1012(b); Ojo v. Farmers Group, Inc., 600 F.3d 1201, 
1203 (9th Cir. 2010) (en banc) (per curiam). 


[2] 
 See Metro. Hous. Dev. 
Corp. v. Vill. of Arlington Heights, 558 
F.2d 1283, 1293–94 (7th Cir. 1977) (recognizing that a village’s refusal to 
rezone plaintiffs’ property to accommodate federally financed low-cost housing 
had the potential to effect a strong discriminatory impact capable of violating 
the federal FHA); United States v. City of Black Jack, 508 F.2d 1179, 
1184 (8th Cir. 1974) (“Title VIII [the FHA] is designed to prohibit all forms of 
discrimination, sophisticated as well as simple-minded.” (internal quotation marks omitted)); cf. Pfaff v. U.S. 
Dep’t of Hous. and Urban Dev., 88 F.3d 739, 747–50 
(9th Cir. 1996) (holding that the Department of Housing and Urban Development 
(HUD) failed to establish a prima facie case against a private landlord that a 
facially neutral, numerical occupancy restriction illegally discriminated 
against families with children, and admonishing HUD for alleging such 
restrictions were discriminatory); Simms v. First Gibraltar Bank, 83 F.3d 
1546, 1555–56 (5th Cir. 1996) (holding that a jury verdict awarding damages for 
disparate impact discrimination under the federal FHA was not supported by 
sufficient evidence when the plaintiff identified only a bank’s rejection of his 
loan application, rather than a specific bank policy or practice, as having 
adverse, discriminatory effects on minorities).  But 
see Town of Huntington v. Huntington Branch, NAACP, 488 U.S. 15, 16 (1988) 
(per curiam) (refusing to address whether a town’s 
refusal to rezone violated the federal FHA and provided a cause of action based 
on disparate impact).
 

[3] 
We note the conundrum this creates: without 
reverse-preemption of the federal FHA by Texas law, Ojo would have a disparate impact cause of action for 
insurance pricing under the federal FHA, and yet, reverse-preemption is 
only at issue if the federal FHA does not “specifically relate[] to the business 
of insurance.”  15 U.S.C. § 1012(b).   
However, this is not an issue the certified question requires us to 
resolve.  We instead focus our attention on whether Texas law provides for 
a disparate impact cause of action for insurance pricing based on credit 
scoring.

[4] 
The Texas Government Code also prohibits fire 
departments from administering tests that disparately impact “any group defined 
by race.”  Tex. Gov’t Code § 
419.103.  These tests must also comply with Chapter 21 
of the Labor Code, which occurs when “the disparate impact on a group is the 
result of a bona fide occupational qualification.”  Id. § 
419.103(b). 

[5] 
 See 
Harris County Hosp. Dist. v. Tomball Reg’l Hosp., 
283 S.W.3d 838, 847 (Tex. 2009) (“The 
judiciary’s task is not to refine legislative choices . . . .  The 
judiciary’s task is to interpret legislation as it is written.”); Cameron v. 
Terrell & Garrett, Inc., 618 S.W.2d 535, 540 (Tex. 1981) (“It is 
a rule of statutory construction that every word of a statute must be presumed 
to have been used for a purpose . . . [and] we believe every word excluded from 
a statute must also be presumed to have been excluded for a purpose.”); 
cf. Tex. Natural Res. Conservation Comm’n v. 
IT-DAVY, 74 S.W.3d 849, 854 (Tex. 2002) (similarly holding that in the realm 
of statutory waiver of sovereign immunity, it is the Texas Legislature’s task to 
“weigh the conflicting public policies” in enacting statutes providing for such 
waiver).

[6] 
 See, e.g., Rizzo, 564 
F.2d at 147 (noting that “[a]lthough the legislative 
history of Title VIII [the FHA] is somewhat sketchy, the stated congressional 
purpose demands a generous construction of Title VIII”); City of Black 
Jack, 508 F.2d at 1184 (recognizing that the FHA was “passed pursuant to the 
congressional power under the Thirteenth Amendment to eliminate the badges and 
incidents of slavery,” and noting that the United States Supreme Court has 
treated the entire Civil Rights Act of 1866, another act passed under the power 
of the Thirteenth Amendment, broadly (citing Jones v. Mayer Co., 392 U.S. 
409, 442–43 (1968) (“[W]hen racial discrimination herds men into ghettos and 
makes their ability to buy property turn on the color of their skin, then it too 
is a relic of slavery.”))).

[7] 
 See, e.g., Rizzo, 564 F.2d at 
146 (“Given the increased burden of proof which Washington v. Davis and 
Arlington Heights now place upon equal protection claimants, we suspect 
that Title VIII will undoubtedly appear as a more attractive route to 
nondiscriminatory housing, as litigants become increasingly aware that Title 
VIII rights may be enforced even without direct evidence of discriminatory 
intent.”); Vill. of Arlington 
Heights, 558 F.2d at 1290 (“[A] requirement that the plaintiff 
prove discriminatory intent . . . is often a burden that is impossible to 
satisfy.”);  City of Black Jack,  508 F.2d at 1185 (“Effect, 
and not motivation, is the touchstone, in part because clever men may easily 
conceal their motivations . . . .”); see also Peter E. Mahoney, The End(s) of Disparate Impact: 
Doctrinal Reconstruction, Fair Housing and Lending Law, and the 
Antidiscrimination Principle, 47 Emory L.J. 409, 425–26 (1998) 
(noting that many federal courts in the years after enactment of the FHA 
“aggressively expand[ed] the scope and application of 
equal protection analysis to a host of local governmental activities” because of 
the “difficulty of proving an overt intent to discriminate,” which led to a 
similar expansion of the protection afforded by the FHA).

[8] 
 See 15 U.S.C. § 1011 (“Congress 
hereby declares that the continued regulation and taxation by the several States 
of the business of insurance is in the public interest, and that silence on the 
part of the Congress shall not be construed to impose any barrier to the 
regulation or taxation of such business by the several States.”); W. & S. 
Life Ins. Co. v. State Bd. of Equalization of Cal., 451 U.S. 648, 654 (1981) 
(stating that Congress passed the MFA “believing that the business of insurance 
is ‘a local matter, to be subject to and regulated by the laws of the several 
States’” (citing H.R. Rep. No. 143, at 2 (1945)));  In re Title Ins. 
Antitrust Cases, 702 F. Supp. 2d 840, 871 (N.D. Ohio 2010) (“Indeed, it 
would seem that this type of activity [setting insurance rates] is precisely the 
kind that the McCarran-Ferguson Act meant to leave to the state legislatures to 
regulate.”).

[9] 
In 2003, EPIC Actuaries, LLC published a study 
reviewing more than 2.7 million auto insurance policies and found that an 
insured’s credit-based insurance score is directly connected to the insured’s 
likelihood of filing a claim, and that credit scoring measures risk not 
previously measured by other rating factors and is among the top predictors of 
risk.  See Michael J. Miller & Richard A. Smith, The Relationship of Credit-Based Insurance 
Scores to Private Passenger Automobile Insurance Loss Propensity (June 
2003), 
http://www.ask-epic.com/Publications/Relationship%20of%20Credit%20Scores_062003.pdf.

[10] The letter 
specifically stated:
Disproportionate impact is a lack of symmetry, or 
unequal percentages.  In other words, disproportionate impact is an uneven 
distribution of each racial group with a given risk factor, although the uneven 
distribution is not caused by one’s race. . . .  By the 
nature of risk-based pricing and underwriting, all factors used in insurance 
have a disproportionate impact to some extent.  One could make a convincing 
argument to ban the use of all risk-related factors based solely on 
disproportionate impact.  Effectively, we would ban risk-based pricing and 
underwriting and revert to a pricing system where we homogenize the risk and 
essentially charge everyone the same price—regardless of risk.  That would 
be a set-back to all Texans, of all races, especially those of moderate to lower 
income whose risk remains low.
As Commissioner, I have the authority to end a practice 
that is either unfairly or intentionally discriminatory.  However, I do not 
have a legal basis to ban a practice that has a disproportionate impact if it 
produces an actuarially supported result and is not unfairly or intentionally 
discriminatory.  Prior to the study, my initial suspicions were that while 
there may be a correlation to risk, credit scoring’s value in pricing and 
underwriting risk was superficial, supported by the strength of other risk 
variables.  Hence, there would be evidence that credit scoring was a 
coincidental variable that served as a surrogate for an unlawful factor in 
rating and underwriting.  If this were proven to have been the case, I 
would have had a legal basis to make the connection between disproportionate 
impact and intentional discrimination, and . . . ban credit scoring outright . . . 
.
The study, however, did not support those initial 
suspicions.  Credit scoring, if continued, is not unfairly 
discriminatory as defined in current law because credit scoring is not based on 
race, nor is it a precise indicator of one’s race. . . .
. . . . 
Allowing credit scoring to be used . . . will ensure its 
link to risk under some of the strongest consumer protections in the nation, 
especially for people that suffer hardship.  However, if the presence of 
credit scoring in insurance will only feed suspicion and divide us as Texans, 
its continued use to any degree may simply not be worth it.  If the 
Legislature determines that credit scoring should be eliminated, then I 
recommend that it be phased out over time.
Letter from Jose Montemayor to the 79th Texas Legislature (Jan. 31, 2005) 
(accompanying Tex. Dep’t of Ins., Supplemental 
Report to the 79th Legislature: Use of Credit Information by Insurers in Texas: 
The Multivariate Analysis (Jan. 2005), 
http://www.tdi.state.tx.us/reports/documents/credit05sup.pdf) (emphasis 
added).